**S. H. CAMP & CO. v. NATIONAL LABOR RELATIONS BOARD (JACKSON SURGICAL GARMENT WORKERS, Inc., Intervenor).**

No. 9672.

Circuit Court of Appeals, Sixth Circuit.
April 3, 1947.

M. F. Badgley, of Jackson, Mich. (Bisbee, McKone, Badgley & McInally, of Jackson, Mich., on the brief), for S. H. Camp & Co.

Frank Blackman, of Jackson, Mich. (Blackman & Blackman, of Jackson, Mich., on the brief), for intervenor Jackson Surgical Garment Workers, Inc.

Robert T. McKinlay, of Washington, D. C. (Gerhard P. Van Arkel, Morris P. Glushien, A. Norman Somers, Leonard Appel and Margaret M. Farmer, all of Washington, D. C., on the brief), for N. L. R. B.

Before HICKS, SIMONS and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

On motion of the respondent, National Labor Relations Board, its petition for enforcement of its original order in this case was remanded by this court for reconsideration by the Board in the light of an opinion by the Comptroller General that the Labor-Federal Security Appropriation Act of 1944, 57 Stat. 494, precluded the use of Board funds in connection with a complaint, where the charge upon which it was grounded was filed prior to the execution

of an agreement between management and labor.

Subsequently, the Board changed its position and moved us to vacate the order of remand upon the ground that the Appropriation Act of 1944 had expired and that, inasmuch as the Labor-Federal Security Appropriation Act of 1945, 58 Stat. 547, does not apply to agreements with labor organizations formed in violation of section 158, paragraph 2, Title 29 U.S.C.A., the previously existing grounds for remand existed no longer. The motion of respondent to vacate the order of remand was denied by per curiam of October 6, 1944, for the reason that the issue in respect of the violation of the 1944 Act by respondent in its proceedings against petitioner involved a question of fact concerning which we were not then fully advised, and that presentation of evidence and additional findings would, perhaps, be required. We stated that the retroactive character of the exception noted in the 1945 Act involved a question of law based upon factual considerations and legislative history upon which we were not then informed; and that we should have the fully considered and deliberate judgment of the National Labor Relations Board after a further hearing.

Following the remand, the Board issued on October 27, 1944, and served on all parties a notice requesting the filing of statements supported by briefs, if desired, setting forth their respective positions concerning the points upon which the cause had been remanded, as well as an indication of whether a further hearing before the Board or a Trial Examiner was desired; and, if so, the general nature of the evidence which would be offered at the hearing. The notice further requested the parties, in the event that they desired to adduce no additional evidence, to indicate whether oral argument before the Board was desired.

The intervenor, Jackson Surgical Garment Workers, Inc. (the independent union), in response to the notice, filed a motion to strike the Trial Examiner's intermediate report, the Board's decision and order, and all other proceedings after July 12, 1943, the effective date of the aforementioned 1944 amendment. The motion was denied, and no additional proof was offered by any of the parties. After hearing further oral argument, the Board, on April 7, 1945, rendered a supplemental decision and promulgated an amended order. It was held that the limitations in the 1944 and 1945 Appropriation Acts for the Board do not constitute substantive amendments to the National Labor Relations Act, but merely control the supply of Board funds and the purposes for which the same may be used during the fiscal periods involved. The Board reasoned that the 1945 Appropriation Act excepts from the limitation of the use of Board funds cases, such as the instant one, arising out of "agreements with labor organizations formed in violation of " section 8(2) of the National Labor Relations Act. Therefore, there was found to be no preclusion in the Act itself or in the 1944 or the 1945 Appropriation Acts upon the expenditure by the Board of money appropriated for the fiscal year of 1945 in proceeding with the instant case.

The Board confirmed its previous decision and order, entered on October 4, 1943, except with the following amendment: "In view of the Comptroller General's ruling of April 20, 1944, we shall amend our original order so that the effective period of the 1944 limitation, namely July 12, 1943 to June 30, 1944, shall be excluded in the computation of the back pay due the eight employees discriminatorily discharged by the respondent pursuant to the terms of its union-shop contract with the Surgical Workers. The net earnings of these employees during that period shall likewise be excluded in computing their back-pay award. For the same reason, we shall not order the respondent to reimburse its employees who were members of the Surgical Workers for dues and assessments which the respondent deducted from their wages on behalf of the Surgical Workers, during the time the 1944 limitation was in effect. For the reasons which we have indicated, we do not think that the Act requires us to modify our order. We do conclude, however, that this disposition of the case is the result most likely to accord with the purposes of the Congress in enacting the Appropriation limitations."

Accordingly, in the Board's amended order to make whole eight named women employees for any loss of pay suffered by them as a result of the company's discrimination against them, the period between June 12, 1943, and June 30, 1944, was expressly excluded from computation. Likewise, the directed reimbursement of all employees who were members of the independent union, for dues and assessments deducted from their wages on behalf of that union, was excluded for the same period.

■ (1) We do not concur in the contention of the petitioner, S. H. Camp and Company, or the intervenor, Jackson Surgical Garment Workers, Inc., that the National Labor Relations Board lost jurisdiction in this matter after the Act of July 12, 1943, became effective. The decision of the Board rests upon sound rationale and is supported by the thoroughly considered and well reasoned opinion of the Ninth Circuit Court of Appeals in National Labor Relations Board v. Thompson Products, Inc., 141 F.2d 794, 797, 798, 799, wherein the legislative history of the pertinent appropriation legislation is detailed,[1] with the resultant conclusion that the rider to the Appropriation Act prohibiting the use of funds in a complaint case arising out of an agreement between management and labor which had been in existence for at least three months without complaint being filed was not intended to be a substantive amendment to the National Labor Relations Act. As Judge Stephens stated [141 F.2d at page 798], the views of opponents to the enactment of legislation may not "be relied upon as indicative of legislative intent although the statements of those in charge of a bill may be considered as evidence of its meaning." See Wright v. Vinton Branch, 300 U.S. 440, 463, 464, 57 S.Ct. 556, 81 L. Ed. 736, 112 A.L.R. 1455, and cases there cited; McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493, 494, 51 S.Ct. 510, 75 L.Ed. 1183. Cf. United States v. United Mine Workers of America (United States v. John L. Lewis), 67 S.Ct. 677. The deci-

sion of the Board has further authoritative support. In National Labor Relations Board v. Baltimore Transit Co., 4 Cir., 140 F.2d 51, 58, a motion to stay proceedings on the ground that a proviso attached to the Board's current appropriation precluded enforcement of its order in the Court of Appeals was denied. It was thought by the Court of Appeals for the Fourth Circuit to be manifest that a limitation upon spending by the Board may not be construed as a limitation upon the jurisdiction of the reviewing court to enforce an order of the Board. In dealing with the same appropriation law here involved, the Court of Appeals for the Second Circuit had previously reached a similar conclusion. That court held, moreover, that a petition for enforcement of the Labor Board's order against an employer, upon findings that the employer had dominated and supported an employees' association and had coerced its employees not to join a local union affiliated with a national labor organization, did not present a case involving a labor agreement within the meaning of the Act prohibiting the use of funds [57 Stat. 515] "in connection with a complaint case arising over an agreement between management and labor which has been in existence for three months or longer without complaint being filed." National Labor Relations Board v. Elvine Knitting Mills, 2 Cir., 138 F.2d 633, 634.

In National Labor Relations Board v. National Tool Co., 6 Cir., 139 F.2d 490, this court said: "It is not the function of this court to inquire into the propriety of expenditures by the National Labor Relations Board of funds appropriated to its use by the Congress."

■ (2) The argument of the petitioner that the Labor Board failed to comply with our mandate in this case is not impressive. The petitioner and all other parties were duly notified by the Board of their right to present additional evidence, if desired. Petitioner did not avail itself of the proffered opportunity. The record contains more than 525 pages of testimony and 165 pages of exhibits, which had already been re-

---

[1] National Labor Relations Board Appropriation Act, 1944, Title IV, Labor-Federal Security Appropriation Act, 1944, Pub. 135, Ch. 221, 78th Cong., 1st Sess., H.R.2935, 57 Stat. 515, approved July 12, 1943. 89 Cong.Rec.6648, 6650, 7103, 6046, 7024, 7025, 7026, 7108.

ceived in evidence, and adequately presents the merits of the controversy. No duty rested upon the Board to adduce further evidence; and its procedure, after remand, was not unfair to either the petitioner or the intervenor. In our view, they were accorded adequate opportunity to be heard on all issues presented by the controversy.

(3) And now, passing to the merits, the amended order of the Board conformed to its original order entered October 4, 1943, except in that, as heretofore stated, the period between June 12, 1943, and June 30, 1944, was excluded from allowance of loss of pay suffered by eight specified women employees. The reimbursement of all employees for dues and assessments deducted from their wages on behalf of the independent union during the same period was also foreclosed by the amended order.

The company was directed, in the customary language of such Board orders, to cease and desist from dominating or interfering with the Jackson Surgical Garment Workers, Inc.; from supporting or recognizing it as representative of the employees as their bargaining agent; from giving effect to the contract of January 7, 1943, with that independent union, or any extension, renewal or supplemental modification of the contract; from discouraging membership in the C. I. O. union, the Amalgamated Clothing Workers of America; and from, in any other manner, interfering with or coercing the company's employees in the exercise of their right to self-organization.

The usual affirmative action was also directed in the disestablishment of the independent union and the withdrawal of recognition of it as the representative or bargaining agent of the company's employees. The eight named employees were directed to be "made whole"; and all employees were ordered to be reimbursed for wage deductions for the benefit of the independent union, with the exceptions heretofore noted. The customary posting of notices and the notification of the regional director were, of course, also ordered.

██ Both the petitioner and the intervenor insist that there is no substantial evidence to support the findings of fact, conclusions, decision and order of the respondent, National Labor Relations Board. Were

it our function on a review of this character to weigh evidence for the determination of the side upon which preponderance rests, the argument might carry greater weight. But such is not the case. We are not permitted to substitute our own inferences from evidence, even though circumstantial, for inferences drawn by the Board.

The Supreme Court has admonished, again and again, the Courts of Appeal of their most limited power of review in controversies of which the National Labor Relations Board has taken cognizance and exercised jurisdiction. Citation of authorities would seem useless at this late date; but, lest we forget, see: National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 208, 209, 226, 60 S.Ct. 493, 84 L.Ed. 704; National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 342, 343, 60 S.Ct. 918, 84 L.Ed. 1226; International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 596, 597, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Electric Vacuum Cleaner Co., 315 U.S. 685, 697, 62 S.Ct. 846, 86 L.Ed. 1120. For later expression, see Packard Motor Car Company v. National Labor Relations Board, 67 S.Ct. 789. Only a few illustrations of the numerous cases in which this court has observed the admonition of the Supreme Court will be cited. National Labor Relations Board v. Capitol Greyhound Lines, 6 Cir., 140 F.2d 754, 759, certiorari denied 322 U.S. 763, 64 S.Ct. 1285, 88 L.Ed. 1590; National Labor Relations Board v. American Creosoting Co., 6 Cir., 139 F.2d 193, 195, certiorari denied 321 U.S. 797, 64 S.Ct. 937, 88 L.Ed. 1086; National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 130 F.2d 363, 367, 368; Triplex Screw Co. v. National Labor Relations Board, 6 Cir., 117 F.2d 858, 859, 860.

██ Inasmuch as the findings of fact of the National Labor Relations Board, which virtually adopted those of the trial examiner, are supported by substantial evidence and its inferences and conclusions therefrom fall within the classification of those for which we must not substitute our own,

it follows that the decision of the National Labor Relations Board must be upheld.

Only a brief review of the facts, without discussion of the evidence, would seem to be required. The findings, conclusions and recommendations of the trial examiner were adopted by the Labor Board with only the modification that no discrimination against three named women employees having been shown, the charges affecting them should be dismissed. The Board's basic findings of fact were that the initial impetus to the formation of the intervenor union, Jackson Surgical Garment Workers, Inc., stemmed from preliminary organizational activities, beginning in May 1937, by Siegrist, foreman of the cutting room in the company's plant. He became the first president of the organization and held that office for more than three years. Harrington, supervisor in charge of the receiving department, became first secretary of the independent union, whose early meetings in 1937 were called by Siegrist and were held in the cafeteria maintained by the company in its plant. During working hours, two foreladies solicited employees to join the union, the by-laws of which admitted to membership all employees as high up as plant superintendent. Supervisory employees could hold any office, except membership on the factory relations committee, the collective bargaining representative of the employees. The framework devised for the administration of the union and the steps subsequently taken by supervisory officials were found to show the independent union to have been an illegal labor organization within the meaning of the National Labor Relations Act.

During the fall of 1940, the Textile Workers Union of America, C. I. O., attempted to organize the employees of the company. On October 14, 1940, Siegrist called a meeting of the Jackson Surgical Workers Union and stated that one of the purposes of the meeting was to decide whether or not the employees desired to continue its life as a labor organization. According to the minutes, its continuance was resolved by a vote of 59 to 32. Christian H. Fleck, Jr., son of the executive vice-president of the company, was elected president of the company-fostered union.

At a subsequent meeting of the directors and officers, the negotiation of a contract with the company was suggested; and Fleck, Jr. recommended that an attorney who had formerly been his father's personal counsel be retained. The suggestion was adopted and the attorney drafted a proposed contract, which was submitted to the membership at a meeting on November 4, 1940, presided over by Fleck, Jr.

The Labor Board found that, with nothing more than signed applications and without checking the payroll to determine whether the independent union represented a majority of its employees, the company undertook negotiations with the Surgical Workers Union. The proposed contract was submitted to Fleck, Sr., and in turn the company submitted to the membership of the labor organization, at a meeting on November 18, 1940, the draft of a counter proposal. On January 10, 1941, a one-year contract was signed between the Jackson Surgical Garment Workers, Inc., and the company. The Board considered it significant that Fleck, Jr., took an important part in initiating negotiations culminating in the contract negotiated at the time when the C. I. O. union began its campaign for membership among the company employees.

One year later, a second agreement was entered into between S. H. Camp and Company and Surgical Workers. At this time, there were 403 employees in the unit covered by the agreement, and a list of names of 238 alleged members of the independent union was submitted to the company. The names of the purported members were merely listed, not signed. Nevertheless, the company denied the C. I. O. union, which claimed a majority of the employees, a bargaining conference while negotiations were pending with the Surgical Workers. The Board found that, in failing to meet with the union representatives, the company did not treat the representatives of the competing unions impartially, in that it afforded the C. I. O. union no opportunity to furnish proof of its claimed majority, but signed a new contract with the Surgical Workers union on January 7, 1943, without making a proper investigation of the claims to majority representation. The refusal of the company to meet with the organized labor

union's representatives for discussion of its claim to majority representation was deemed an interference with the concerted activity of its employees within the meaning of section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.

It was found, moreover, that within a few days before the contract of January 7, 1943, was signed, the company permitted representatives of the Surgical Workers to solicit openly during working hours petitions for membership; while, at the same time, reprimanding C. I. O. adherents for engaging in similar activities. It was found, further, that three days before the contract was signed, the company posted notices on its bulletin boards, stating that at the request of the Surgical Workers the plant would close fifteen minutes before the usual closing hour for the obvious purpose of permitting the employees to attend a scheduled meeting of the Surgical Workers. This was considered additional evidence of illegal assistance of that union.

Various statements and remarks of foreman Siegrist, supervisor Clara Jones, and forelady Brown, unnecessary to be narrated, were found to constitute interference, restraint and coercion by the company of its employees in the exercise of their rights guaranteed in the Act. It was also found that, on January 21, 1943, following the signing of a consent election agreement between the Surgical Workers and the C. I. O. Union, in which the latter executed a waiver of protest of any unfair labor practice allegedly committed by the company concerning which charges had been filed by the union on January 5, 1943, the company gave wage increases to 71 employees and permitted the Surgical Workers to announce, or to participate with the management in the announcement, to nearly all the employees concerned that the rate increases had been granted, notwithstanding the fact that the Surgical Workers had no part in initiating or obtaining favorable action "on most of the requests for rate increases granted to the employees just prior to the date set for the consent election."

From this, it was inferred that the Surgical Workers would unfairly obtain credit for the increases and thus influence favorable votes for their organization in the pending election. On the day before February 4, 1943, the date set for the election, Schultz, a national representative of the C. I. O. union, arrived in Jackson, Michigan. Learning of the wage increases, he telephoned a regional director of the Board in Detroit, who told him to discuss the situation with Field Examiner Cassidy who had left Detroit and was on his way to Jackson to conduct the election. Cassidy, accompanied by another field examiner, Bannasch, arrived in Jackson on February 4, around 2:18 o'clock P.M. Schultz met him about ten minutes later and complained about the granting of the wage increase. The two field examiners then went to the company's plant to discuss the wage increases with vice-president Fleck.

After a lengthy conversation, Cassidy informed the company vice-president that he intended to call off the election. This was done by notices posted on the plant bulletin boards. By 4:30 P.M., handbills were being distributed by the C. I. O. union stating that the election had been called off. The contention of the company and the intervenor union that the election had been called off after a prearranged understanding between Cassidy and Schultz, as evidenced by the quick distribution of the handbills, was considered to have been met by the uncontradicted testimony of Schultz that he had ordered the handbills to be prepared before he first saw Field Examiner Cassidy that afternoon. He had caused the handbills to be printed so as to be ready for distribution by 4:30 P.M.

The Board concluded, from its findings of fact, that the company had interfered with, restrained and coerced its employees in violation of section 7 of the National Labor Relations Act; and that the various kinds of assistance rendered by the company to the Surgical Workers union made the contract of January 7, 1943, illegal under section 8(3) of the Act, 29 U.S.C.A. § 158(3).

The facts encountered here do not bring this case within the ambit of National Labor Relations Board v. Sparks-Withington Co., 6 Cir., 119 F.2d 78, wherein the employer's activities fell far short of the fostering of the independent union observable from the present record. This case is

closer akin to National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 130 F.2d 363, 368, supra, where we said that "the test, whether a challenged organization is employer controlled, is not an objective one but rather subjective, from the standpoint of employees." Likewise, the instant case bears closer relationship to National Labor Relations Board v. Elyria Telephone Company, 6 Cir., 158 F.2d 868, decided December 14, 1946, where, in the circumstances, the announcement of wage increases by the employer during the pendency of an election to choose the bargaining agent of its employees was deemed to have been justifiably held by the Board to be an unfair labor practice.

 The action of the representative of the National Labor Relations Board in calling off the bargaining agency election immediately before the time set for the casting of ballots is not in the least commended. But, as we said in National Labor Relations Board v. Porcelain Steels, Inc., 6 Cir., 138 F.2d 840, 841: "Election methods considered 'suitable' by the courts are not to be substituted by them, for the reason that the National Labor Relations Act vests power in the Labor Board, not in the courts, to select the method of determining what union, if any, employees desire as their bargaining agent. National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 458, 60 S.Ct. 307, 84 L.Ed. 396." Cf. National Labor Relations Board v. Capitol Greyhound Lines, supra. Nor have we forgotten that our decision in National Labor Relations Board v. P. Lorillard Company, 6 Cir., 117 F.2d 921, 926, modifying the Labor Board's order so as to require. the conduct of a new election, was reversed by the Supreme Court [314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380].

The decision of the Board in the present controversy finds strong support in International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, where the Supreme Court held that a finding of the National Labor Relations Board, supported by substantial evidence, that a labor organization having a closed-shop contract with an employer had been assisted in its organiza-

tional drive by unfair labor practices, authorized the Board to order the employer to cease and desist from giving effect to the contract.

The petition of S. H. Camp and Company to set aside the order of the National Labor Relations Board issued on October 4, 1943, and amended on April 7, 1945, is dismissed, as is likewise the petition of the intervenor, Jackson Surgical Garment Workers, Inc. The petition of the National Labor Relations Board for enforcement of its order, as amended, is granted; and the amended order of the Board is directed to be enforced.