## BAYLOR UNIVERSITY MEDICAL CENTER, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD.

### No. 76–1940.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1977.

Decided Feb. 14, 1978.

Robert W. Smith, with whom Bowen L. Florsheim, Dallas, Tex., was on the brief, for petitioner.

Paul J. Spielberg, Deputy Asst. General Counsel, National Labor Relations Board, Washington, D. C., with whom John S. Irving, General Counsel, Carl L. Taylor, Associate General Counsel, National Labor Relations Board, Washington, D. C., were on the brief, for respondent.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

MacKINNON, Circuit Judge:

The Baylor University Medical Center ("Baylor") petitions for review of an order of the National Labor Relations Board ("Board") and the Board makes a cross-application for enforcement of its order. Our jurisdiction is conferred by section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(e), (f). The Hearing Examiner conducted an extensive hearing on a complaint issued by the Board[1] charging, inter alia,[2] that Baylor's no-solicitation and no-distribution rule ("the no-solicitation rule")[3] was overly broad and an "unfair labor practice" in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1). The gravamen of the Board's complaint was that this rule prohibited solicitation by employees during their non-working time and barred all forms of solicitation and distribution in any areas of the

---

1. The hearings in the consolidated cases No. 16–CA–5888, 16–CA–6050, and 16–CA–6206 were held on November 4, 5, 6, 1975.

2. Baylor has complied with the NLRB order in every respect except for the portion relating to the no-solicitation and no-distribution rule.

3. The no-distribution aspect of Baylor's rule will not be discussed per se. If solicitation can be banned, so a fortiori may distribution, raising as it does the additional problems of litter and general cluttering, see Stoddard-Quirk Mfg. Co., 138 NLRB 615, 620–621 (1962).

hospital complex where services were administered to patients or where visitors might be disturbed, thereby effectively eliminating solicitation and distribution in all parts of the hospital buildings except for a small employees' locker room.[4] The full rule provided:

> Solicitation of patients or visitors by anyone on Baylor University Medical Center property is strictly prohibited. Solicitation of employees of Baylor University Medical Center by non-employees or the distribution of literature, pamphlets, or other material, by non-employees on Baylor University Medical Center property is prohibited.
>
> Solicitation of employees of Baylor University Medical Center by other employees or distribution of literature between employees is prohibited during work time and/or in work areas. The term "work areas" includes patient care floors, hallways, elevators or any other area such as laboratories, surgery or treatment centers, where any type of service is being administered to or on behalf of patients and also includes any area

where persons visiting patients are likely to be disturbed. Service to our patients and their visitors includes not only primary and acute medical care, but, as you all know, food service and psychological support.

> Unauthorized sales and solicitation of orders for any type of product or service to anyone on Baylor University Center premises are prohibited.[5]

The Board's order, which fully adopted the recommended decision of the Hearing Examiner,[6] required the hospital to cease and desist from enforcing this rule and to rescind any restriction on employees' solicitation other than in "immediate patient care areas."[7] In light of the general rule that solicitation cannot be proscribed during non-working time nor distribution during non-working time in non-working areas,[8] the Board—while it recognized the special circumstances presented by a hospital environment to the extent of conceding that Baylor could prohibit solicitation at all times within "immediate patient care areas"[9]—invalidated any ban on solicitation

---

4. This locker room contains no more than 350 lockers, whereas there are some 3,700 employees at Baylor.

5. This rule was "clarified" on June 21, 1975 by the posting of the following rule:

> Solicitation of patients or visitors by anyone for any purpose on Baylor University Medical Center property is strictly prohibited. Solicitation of employees of Baylor University Medical Center by non-employees or the distribution of literature, pamphlets or other material, by non-employees on Baylor University Medical Center property is prohibited.
>
> Unauthorized sales and solicitation of orders for any type of product or service to anyone on Medical Center Premises are prohibited.
>
> Solicitation of employees at Baylor University Medical Center by other employees or distribution of literature between employees is prohibited during work time or in work areas. The term "work area" includes patient care floors, hallways, elevators, conference rooms and places where employees confer on business, or any other area such as laboratories, surgery or treatment centers, where any type of service is being administered to or on behalf of patients and also includes any areas where persons visiting patients may be disturbed. Service to our

patients and their visitors includes not only primary and acute medical care, but also food service and psychological support.

The Hearing Examiner had both rules before him in considering the case.

6. The NLRB—Fanning, Penello and Walther members—said nothing in their decision except that "the Board has considered the record and the attached decision in light of the exceptions and briefs and has decided to affirm the rulings, finding and conclusions of the [Hearing Examiner] and to adopt his recommended order." J.A. at 27.

7. J.A. 27–28.

8. See Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); D'Yourville Manor, Lowell, Mass. v. NLRB, 526 F.2d 3 (1st Cir. 1975).

9. The Hearing Examiner adopted the language of the NLRB in its St. John's Hospital and School of Nursing, Inc., 22 NLRB No. 182, 91 LRRM 1333 (1976):

> We recognize that the primary function of a hospital is patient care and that a tranquil atmosphere is essential to the carrying out of that function. In order to provide this atmosphere, hospitals may be justified in impos-

insofar as it applied to most of (1) the corridors, (2) to the cafeteria and (3) vending machine areas. The exclusion of these parts of the hospital from the permissible scope of the hospital's no-solicitation rule is the main point of contention between the parties.

We find that the record evidence compels the conclusion that the situation in Baylor involves unique circumstances which justify a broad proscription on solicitation and distribution. In its resolution of this case the NLRB has not adequately discharged its responsibility to effectuate congressional policy,[10] which unquestionably has been concerned to avoid disruptions in hospitals. We adopt petitioner's contention that it is not an unfair labor practice to bar solicitation in Baylor's corridors. Furthermore, we feel that a strong line of authority arising in contexts other than that of health care facilities establishes the validity of the no-solicitation rule in the cafeteria and vending area.

The Hearing Examiner evidently felt compelled to limit Baylor's proscriptions on solicitation as he did because of the Board's recent decision in *St. John's Hospital and School of Nursing, Inc.,* 222 NLRB No. 182, 91 L.R.R.M. 1333 (1976), enforced in part

and denied in part, 557 F.2d 1368 (10th Cir. 1977).[11] However, this decision subsequently was denied enforcement by the Tenth Circuit after the NLRB order in this case was issued, *St. John's Hospital and School of Nursing v. NLRB,* 557 F.2d 1368 (10th Cir. 1977). We agree with the Tenth Circuit that even were it possible—which it manifestly is not—to determine with any confidence and rationality which areas in a hospital are and which are not "immediately" involved in patient care,[12] the Board's overly restrictive position on the valid extent of no-solicitation rules in medical facilities must nevertheless be overturned as insensitive both to the unique conditions found in an acute general hospital and to the declared intent of Congress.

In reviewing an order by the NLRB, courts must accept its determinations if they are supported by "substantial evidence"[13] and give considerable deference to the Board's interpretation of the terms of the NLRA.[14] In this case, however, we find that the Board's decision is both contrary to congressional purpose and outside the Board's area of expertise,[15] and accordingly entitled to little of the deference traditionally accorded to NLRB actions.[16] While we are not at liberty to deny enforcement to an order of the Board merely because we

---

ing somewhat more stringent prohibitions on solicitation then [*sic*] are generally permitted.
J.A. at 21.

10. *Cf. NLRB v. Truck Drivers Local Union # 449,* 353 U.S. 81, 97, 77 S.Ct. 643, 11 L.Ed.2d 676 (1957); *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

11. The Hearing Examiner commented: "The Board's decision in the *St. John's* case is controlling here." J.A. at 22.

12. *See, e. g., St. John's Hospital and School of Nursing v. NLRB,* 557 F.2d 1368, 1372–73 (10th Cir. 1977) ("This distinction between strictly patient care areas and other patient access areas based on the relative conditions of the patients frequenting those areas finds no support in the record. . . . Moreover, this distinction is difficult of application at best and indeed has been rejected by the Board in a similar context as 'specious.' ").

13. *NLRB v. Pipefitters,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 891 (1977); *S. H. Camp & Co. v. NLRB,* 160 F.2d 519 (6th Cir. 1947); 29 U.S.C. § 160(e), (f) (1970).

14. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 43 L.Ed.2d 171, quoting *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); *Phelps Dodge Corp. v. NLRB, supra* note 10.

15. *St. John's Hospital and School of Nursing v. NLRB, supra* note 12, 557 F.2d at 1373 (". . . the Board's own perceptions of modern hospital care and the physical, mental, and emotional conditions of hospital patients— areas outside the Board's acknowledged field of expertise in labor/management relations.")

16. *Cf. NLRB v. Universal Camera Corp.,* 190 F.2d 429, 432 (2d Cir. 1951) (Frank, J., concurring); Winter, *Judicial Review of Agency Decisions: The Labor Board and the Court,* 1968 Sup.Ct.Rev. 53–69.

would have favored a different result,[17] we feel no hesitation in denying enforcement to the instant order.

## I

### The Corridors

The legislative history of the NLRA as it applies to voluntary, non-profit hospitals [18] reveals an unmistakable solicitude for the peaceful functioning of these institutions, even at some expense to employees' right to organize.[19] It was not until 1974 that such institutions—which employ some 55% of all hospital workers—were included within the NLRA, and in the course of amending the scope of the Act's coverage Congress clearly evinced its belief that these facilities presented special problems which mandated a different approach to the application of the NLRA than that taken in other fields.[20]

Many of the witnesses before the Committee, including both employee and employer witnesses, stressed the uniqueness of health care institutions. *There was a recognized concern for the need to avoid disruption of patient care wherever possible.*

It was this sensitivity to the need for continuity of patient care that led the Committee to adopt amendments with regard to notice requirements and other procedures related to potential strikes and picketing.

S.Rep.No. 93–766, 93d Cong., 2d Sess. reprinted in 1974 *U.S.Code Cong. & Admin. News,* vol. 2, 3946, 3951 (emphasis added).

The Board suggested elsewhere that Congress was only concerned to prevent the disruptions that would be caused by actual strikes or picketing,[21] but we find no support for such a narrow reading of the congressional purpose.[22] On the other hand, the clear expressions of congressional concern for avoiding disruptions in the hospital environment that we do find in the legislative history encourages us to give special weight to the needs of patients in striking a balance between preventing possible sources of disruptions in hospitals and protecting employees' right to organize.[23] Moreover, it seems clearly preferable in resolving any doubts as to how best to accommodate these conflicting interests to err on the side of protecting the patients—to whom irreparable injury might be done—rather than on that of a labor organization which can at worst suffer a brief, albeit unjustified delay.[24]

The interested parties should be particularly inclined to avoid possible sources of disruption in the case of a hospital as large and congested as Baylor. In total admissions, Baylor is the seventh largest hospital of the nation's 5,000 "acute care" private

---

**17.** *Brooks v. NLRB,* 538 F.2d 260, 261 (9th Cir. 1976); *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

**18.** The amendments to the NLRA which brought voluntary non-profit hospitals under the scope of the NLRA are contained in Public Law 93–360, 88 Stat. 395 (July 26, 1974).

**19.** *See generally,* Vernon, *Labor Relations in the Health Care Field Under the 1974 Amendment to the NLRA: An Overview and Analysis,* 70 Nw.U.L.Rev. 202, 202 (1975).

**20.** The 1974 Amendments included a series of provisions seeking to discourage strikes and requiring advanced notice of them, July 26, 1974, Pub.L. 93–360, § 1(b)–(e), 88 Stat. 395, 396 (codified at 29 U.S.C. § 158(d), (g) (Supp. V 1975)).

**21.** *See, e. g., St. John's Hospital and School of Nursing, supra* note 12, 557 F.2d at 1374.

**22.** *See generally, id.*

**23.** No-solicitation rules have long been analyzed in terms of balancing the property rights of the employer and the organizational rights of the employees, *see, e. g., NLRB v. United Steelworkers of America,* 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1957); *NLRB v. The Babcock and Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). In this case, it is not the non-profit employer but rather its patients whose interests are in conflict with those of the employees.

**24.** *See St. John's Hospital and School of Nursing, supra* note 12, 557 F.2d at 1371 ("A cautious judgment in such regard must note that error in such judgment may cause irreparable damage to patients, and thus to the public, while error in the other direction can be salvaged by the Board under proper use of its overall expertise in labor matters.")

and charitable hospitals, fourth largest in surgical procedures, and second in bed capacity. It employs over 3,700 individuals to maintain its 1,125 beds and care for the 44,000 in-patients who are admitted there each year. There was testimony before the Hearing Examiner that some 15,000–20,000 persons entered the hospital each day [25] and that the passageways and corridors were "as crowded as the main streets of downtown Dallas." [26] It is remarkable that conditions at Baylor are not more chaotic than they are; certainly the imposition of any additional sources of potential disruption should only be required reluctantly and after a far more detailed analysis than the NLRB devoted to this particular case.[27]

Although respondents make much of Baylor's history of alleged anti-union bias,[28] there is no indication that its no-solicitation rule was in any way discriminatory or directed against efforts at unionization.[29] The hospital takes a variety of other precautions against excess noise and crowding. For example, all employees are required to leave their work areas when they take their breaks from work,[30] and the hospital has maintained a ban on all forms of solicitation for some fifteen years [31]—long before there was any movement to unionize at Baylor.

The importance of preventing crowding and disruption in the hospital corridors cannot be seriously debated. Experienced witnesses testified of the extent to which congestion in the corridors impedes the operation of the medical staff and annoys patients and visitors.[32] Quick and unimpeded passage through the hallways was shown to be imperative to the efficient operation of the hospital and to the success of certain of its emergency services, such as the cardiac arrest unit.[33] The hallways serve not only as passageways for patients, visitors, doctors, and medicine,[34] but also as viewing rooms for the nursery [35] and storerooms for a variety of hospital equipment which must be available at a moment's notice.[36] There was also testimony that a great deal of the physical therapy undertaken at Baylor actually took place in the corridors,[37] and that for many departments the corridors served

---

25. Petitioner's Brief at 10–11.

26. Testimony of Mr. Howard M. Chase, Associate Executive Director of Baylor, J.A. at 161.

27. See NLRB v. Beth Israel Hospital, 554 F.2d 477, 482 (1st Cir. 1977), cert. granted, —— U.S. ——, 98 S.Ct. 764, 54 L.Ed.2d 780 (1978).

28. Respondent's Brief at 4–6.

29. Compare NLRB v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638 (1949); Bonwit Teller, Inc. v. NLRB, 197 F.2d 640 (2d Cir. 1952), cert. denied, 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953). Respondent points out that Baylor does allow solicitation for the United Fund and the American Cancer Society, as well as holding an occasional bake sale and benefit fair (a program designed to acquaint the employees with the benefits available to them). Respondent's Brief at 20–21; J.A. 173–181. The fact that Baylor permits such activities while banning other forms of solicitation does not, however, indicate illicit discrimination on the part of petitioner, as the solicitations which are permitted are manifestly nondisruptive and carefully controlled (the Cancer Society solicitation, for example, consisted only of a note included in each employee's paycheck) J.A. at 174, Testimony of Mr. Howard Chase. These solicitations are part of a normal hospital operation and all lack the emotionally disturbing aspect of union solicitation in that they could not conceivably raise fears in patients or visitors that they might not receive the best possible health care.

30. J.A. at 312, testimony of Linda Hiatt, Director of Nurses in Truett Hospital (one of Baylor's wings).

31. J.A. at 155, Testimony of Mr. Howard Chase.

32. J.A. at 169–170, Testimony of Mr. Jack Hays, Administrator of the Department of Physical Medicine, J.A. 293; Testimony of Linda Hiatt, J.A. at 313.

33. J.A. at 182, Testimony of John Hicks, Administrator of Jonsson Hospital (one of Baylor's wings); J.A. 217, Testimony of William Rohloff.

34. J.A. 193–194, Testimony of John Hicks; J.A. 159–160, Testimony of Howard Chase.

35. J.A. 161, Testimony of Howard Chase.

36. J.A. 310, Testimony of Linda Hiatt.

37. J.A. 285–286, Testimony of Jack Hays.

as the only available waiting room.[38] It is in large measure true, as petitioner insists,[39] that virtually every functioning part of an acute general hospital is involved in patient care,[40] and that at Baylor the corridors seem to serve as much as additional all-purpose rooms than merely as hallways.[41] On the record before us, it is patently unreasonable that the Board would require that solicitation be permitted in the corridors in view of the additional congestion and disruption which it would involve.

Baylor could, as respondent suggests,[42] impose a general, "evenhanded" proscription on noise and loitering in the corridors rather than specifically banning solicitation. To suggest this alternative, however, would only exalt form over substance, as there are very few activities besides solicitation and distribution that could plausibly take place in hospital corridors and result in greater crowding and noise. Moreover, if the NLRB is willing to concede that such a broad rule might be justified by the special characteristics of a hospital (thereby preempting the question of the no-solicitation rule), it is hard to see why it insists that a no-solicitation rule also would not be justified. By rule Baylor prohibits solicitation because it is the most probable potential recurrent cause of disruption in the corridors. Furthermore, solicitation has a disruptive force quite apart from its contribution to noise level and overcrowding. There was evidence at the hearing that witnessing solicitation tends to undermine both patients' and visitors' confidence in the hospital.[43] Having to confront the worry that employees might reduce their standards of

service as part of a labor dispute seems an unnecessary and undesirable additional source of anxiety for persons already hard-taxed emotionally.[44] And the thought that matters affecting one's life and death are perceived in terms of wage increases and coffee breaks by those responsible for one's well-being fully justifies the very upsetting concern that patients and those close to them were shown to have about such activities.[45] It is not only the likelihood that congestion and commotion would result from such solicitation, but also the inherently disturbing effect of interjecting undertones of labor disputes into a situation where sick persons are totally dependent on the unflagging assistance of others that are major factors contributing to the disruptive effect of solicitation. Wherever in the hospital an emotionally vulnerable group of patients and their visitors may be present, we feel that unique considerations come into play which justify an otherwise overly broad no-solicitation rule.

> [I]t must be remembered that Respondents facility is not a manufacturing plant, it is a hospital. And it is in the nature of hospitals that certain of the working areas (hallways, elevators, stairs, patient's rooms, gift shops, etc.) are necessarily open to the use of patients and visitors. . . . Further, the hospital services ill individuals who, in their weakened condition may readily be upset if they overhear anti-union/pro-union arguments . . . . .

*Guyan Valley Hospital,* 198 NLRB 107, 111 (1972).

---

38. J.A. 265, Testimony of Dr. A. D. Sears, M.D. at Baylor.

39. Petitioner's Brief at 10–18.

40. *See generally, NLRB v. Beth Israel Hospital, supra* note 27, 554 F.2d at 482–83 n. 6 ("We would add that a phrase like 'immediate patient-care areas' is far from self-defining given the complexity of a major metropolitan hospital. Would a waiting area by the nurse's desk on a floor where patients reside be a 'patient-care area?' Would the waiting room in the emergency ward?")

41. J.A. 159–160, Testimony of Mr. Howard Chase.

42. Respondent's Brief at 20 n. 15.

43. J.A. 343, Testimony of Dr. A. D. Sears; J.A. at 209, Testimony of Dr. John Goodson, M.D. at Baylor.

44. J.A. at 209, Testimony of Dr. John Goodson; J.A. at 255–256, Testimony of Joseph Gross, Director of Department of Pastoral Care at Baylor.

45. J.A. 255, Testimony of Joseph Gross.

It is surprising that the NLRB changed its own established viewpoint on this matter so utterly, and we find its now repudiated analysis more appropriate than its present position in the instant case.

## II

### The Cafeteria and Vending Areas

The cafeteria and vending areas of Baylor present a considerably different problem from that of the corridors. With regard to the Board's determination that solicitation must be allowed in the hospital's cafeteria and vending area—the other main point of disagreement between the parties—we also overturn the Board's ruling, but do so for a reason virtually the inverse of that which led us to deny enforcement of its invalidation of Baylor's no-solicitation rule as it applied to the corridors. While we held that Baylor's ban on soliciting in the hospital's corridors was justified due to the "special circumstances" of a hospital environment, we hold that a similar proscription covering its cafeteria and vending area is justified because these areas are not materially "special" or different from other restaurants and shops. We find the reasoning of the Tenth Circuit in St. John's Hospital and School of Nursing v. NLRB, supra, to be persuasive:

> As to "other patient access areas such as cafeterias, gift shops, and the like," we conclude that even if it is conceded these areas are not directly related to the Hospital's primary function of providing patient care, the Hospital nevertheless maintains the same commercial interests in these facilities as are held by the management of retail stores and restaurants located in other types of establishments.

Since there is no question that the Hospital would be entitled to prohibit solicitation and distribution in all public access areas of its cafeteria and gift shop were they located anywhere outside the Hospital premises, Marriott Corp. (Children's Inn), 223 NLRB No. 141; McDonald's Corp., 205 NLRB No. 78, we conclude that the Hospital does not lose that right simply because its public cafeteria and gift shop are part of a hospital complex rather than a shopping mall or drive-in restaurant.

557 F.2d at 1375.

Of course, there is not as much medical importance in maintaining the quietness or non-congestion of areas ordinarily as far removed from direct patient care as a public cafeteria or vending area,[46] but such areas in a hospital are not totally devoid of medical significance. Respondent is correct in pointing out that these places are likely to be emotionally disturbing even if solicitation is prohibited. Such arguments, despite the attention paid to them in the parties' briefs,[47] are, however, irrelevant to our analysis. The same exigencies of good medical care that require allowing the prohibition of solicitation in hospital corridors may or may not justify the same proscription in a particular hospital cafeteria, but we hold that whether or not a restaurant or shop is in a hospital, its proprietor can bar solicitation on the premises.

The line of precedent in both court and NLRB decisions permitting blanket no-solicitation rules in restaurants and shops is long and unequivocal.[48] The essential rationale of these cases has been that as the success of such enterprises depends on attracting customers and thus on the conge-

---

**46.** There is no significant issue of impeding passage through the cafeteria or vending area though this might vary depending upon its location within a hospital. Those patients who venture to these places cannot legitimately expect that the same artificially restorative atmosphere created for them in the rest of the hospital will be sustained, though they can expect that some consideration will be given to such needs and that such areas will have the same protection against commotion and disturbance as similar areas outside hospitals.

**47.** See Respondent's Brief at 22–24; Petitioner's Brief at 26–28.

**48.** See, e. g., Marshall Field & Co. v. NLRB, 200 F.2d 375 (7th Cir. 1952, amended 1953); NLRB v. May Department Store Co., 154 F.2d 533 (8th Cir.), cert. denied, 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946); Marriott Corporation, 223 NLRB No. 141, 92 LRRM 1028 (1976); McDonalds of Palolo, 205 NLRB 404, 84 LRRM 1316 (1973).

niality of the atmosphere in their premises,[49] it is reasonable to prohibit practices which tend to disturb or annoy.[50]

Respondents suggest that the precedents involving commercial establishments are inapposite here because—unlike such institutions—hospitals do not risk losing their "customers" due to the irritation of solicitation.[51] While the principal business of retail establishments is attracting customers, a hospital's main concern—it is argued—is patient care, and its shops and cafeterias are no more than peripheral to its main operation. To the extent that this argument has any force whatsoever, it is wholly misplaced in this context. Whether or not patients and their visitors have choice about whether or not to use the hospital, they certainly have a choice about whether or not to use its cafeteria and vending machines. The cafeteria and vending area must still compete to attract the business of the hospital's patients. That a hospital is not "principally" in the restaurant business does not mean that it is not concerned that the restaurants which it does operate should be as attractive and profitable as possible. Public cafeterias in hospitals are operated as a convenience to its patients and their visitors and there is no justification for saddling them with restrictions, not applicable to cafeterias generally, that might from time to time compel them to operate at a loss. Assuming arguendo that a disturbance in the cafeteria would not significantly impede the hospital's health care, Baylor still has an independently valid interest in the profitable and orderly operation of its commercial food services which justifies barring solicitation in its restaurants.

It does not appear from the record, but it may be the case, that Baylor operates its cafeteria and vending machines as a non-profit service, so that in this respect it differs somewhat in its objectives from those of the usual restauranteur. Nevertheless, in providing its services, it has much the same interest, albeit non-financial, that any owner does in making his facilities as pleasant as possible. Whether the motive is monetary enrichment or enriching the overall quality of the hospital environment, employers who operate establishments whose raison d'etre is their pleasantness are justified in imposing otherwise overbroad no-solicitation rules. It is not the goal of making money, but of running a facility whose primary goal is to be attractive that supports the special treatment accorded to restaurants in this regard.

## III

### Conclusion

We recognize that the instant appeal in some ways presents a harder case than did the facts of the *St. John's* decision by the Tenth Circuit, in that Baylor has significantly fewer "employees only facilities" than did St. John's Hospital and Nursing School.[52] Consequently, the extent to which the opportunity for union organization may be reduced by restricting solicitation to areas to which neither patients nor visitors have access may be greater than that sanctioned by the Tenth Circuit. We are, however, by no means confronted here with a situation in which there are no alternative channels through which the employees can communicate for purposes of organization. Where no such channels are available, an employer may be forced to permit solicitation where he otherwise could legiti-

49. *See Marshall Field & Co. v. NLRB, supra* note 48; *May Department Store, supra* note 48; *Goldblatt Bros., Inc.,* 77 NLRB 1262, 1263–64 (1948).

50. The cases in general assume that solicitation will be disruptive and approach no-solicitation rules from the perspective of whether or not employees' right to organize requires that the attendant disruption be tolerated, *see, e. g., Marshall Field & Co. v. NLRB, supra* note 48.

51. Respondent's Brief at 22–24.

52. St. John's Hospital had an employees-only cafeteria in which it was estimated that 80% of the employees ate. There were also "numerous" other employees only areas such as lounges and locker rooms, 557 F.2d at 1375.

mately ban it.[53] Perhaps in different circumstances a hospital would be compelled to allow solicitation in its cafeteria or even in some of its corridors. As regards the situation at Baylor, however, petitioner has testified that its rule does not apply to any area outside the hospital buildings,[54] and it is apparent that the hospital's parking lots, lawns and gardens supply an excellent forum for solicitation. These areas are heavily used by employees, many of whom eat their meals and take their breaks there.[55] Thus, despite the paucity of indoor areas available for solicitation, it is by no means the case—particularly in light of the mild climate in Dallas, which makes the outside areas available virtually all year[56]—that the process of labor organizing would be crucially disadvantaged by limiting solicitation, for the most part, to the out-of-doors.

The mere fact that there are alternative channels available would not, of course, alone justify an otherwise illegal no-solicitation order, but at least when such channels are open, an employer need not modify an otherwise justifiable no-solicitation rule.[57] The instant case may be somewhat harder than St. John's, but not so much so that the principle developed there must be abandoned because the employees are "uniquely handicapped in the matter of self-organization and concerted activity."[58] We do not find that the minor added inconvenience of having to solicit in outdoor areas outweighs our congressionally directed solicitude to avoid disruptions in hospitals.

In conclusion, we note that before its St. John's ruling, the NLRB and the courts both agreed that the special circumstances presented by health care facilities demanded that they be treated differently from other industries under the NLRA.[59] An agency is, of course, free to alter its policies,[60] but the remarkably meager evidence available to the NLRB in the St. John's decision[61] suggests that in reversing its earlier policies the Board in this instance may have had inadequate exposure to the special considerations involved in assessing the proper scope of labor solicitation in health facilities. It is true that one recent case has upheld the rule announced in St. John's NLRB order, NLRB v. Beth Israel Hospital, 554 F.2d 477 (1st Cir. 1977) cert. granted, 434 U.S. 1033, 98 S.Ct. 764, 54 L.Ed.2d 780 (1978), but even there the court was highly critical of applying this rule in broad terms[62] and insisted on a case by case balancing test weighing the particular circumstances in individual hospitals as they came

---

**53.** See, e. g., Republic Aviation Corp. v. NLRB, supra note 8, 324 U.S. at 799, 65 S.Ct. 982, 89 L.Ed. 1372; NLRB v. Lake Superior Lumber Corp., 167 F.2d 147 (6th Cir. 1948).

**54.** J.A. at 129–130, Testimony of Howard Chase. Non-employee solicitors were barred from all Baylor property under its rule.

**55.** J.A. at 324–325, Testimony of Mr. Howard Chase.

**56.** J.A. at 324, Testimony of Mr. Howard Chase.

**57.** The Board insists that the availability of alternative avenues of employee communication are irrelevant until the hospital has rebutted the presumptive illegality of its no-solicitation rule, see Respondent's Brief at 24–28; NLRB v. Magnavox Co. of Tennessee, 415 U.S. 322, 326–27, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). This is a correct reading of the law, but as we find that "special circumstances" of the hospital environment have more than rebutted any such presumption, the Board's argument is without force in this particular case.

**58.** Marshall Field & Co. v. NLRB, supra note 48, 200 F.2d at 381.

**59.** See, e. g., Summit Nursing and Convalescent Home, 472 F.2d 1380 (6th Cir. 1973); Shorewood Manor Nursing Home, 217 N.L.R.B. No. 35, 89 L.R.R.M. 1037 (1975) (Penello, dissenting); Guyan Valley Hospital, 198 NLRB 107 (1972).

**60.** NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 347–52, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

**61.** The St. John's case was submitted to the NLRB on six stipulations and no evidence was presented on the question of how distribution or solicitation would affect patients. Petitioner's Brief at 20.

**62.** Petitioner aptly suggests that the First Circuit in relying on the NLRB ruling in St. John's Hospital could not have realized how scant the evidence on which that decision was based had been. Petitioner's Supplemental Reply Brief at 6.

before the Board. The First Circuit emphasized that hospitals present "unique considerations that do not apply in industrial settings" and that "the Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized." [63] In this case we feel that petitioner has adequately demonstrated that the well-being of patients and visitors and the operation of the hospital would be jeopardized by allowing solicitation in the corridors and wherever else patients or visitors have access.

There is no need for further examination of the conditions at Baylor. Accordingly, we do not exercise our option to remand to the NLRB. Instead, we grant enforcement of its order only insofar as it covers those provisions unrelated to petitioner's no-solicitation rule and deny enforcement as to the remainder.

*So ordered.*

LEVENTHAL, Circuit Judge, concurring in part and dissenting in part:

The majority denies enforcement of a Board order invalidating the hospital's ban against solicitation and distribution of literature in the hospital corridors, cafeteria and vending areas. I concur in the majority opinion insofar as it applies to the hospital corridors. I cannot agree, however, that a rule barring these activities in the cafeteria and vending areas has been shown to be equally defensible. Since the Supreme Court will soon address this issue in another case,[1] I will confine myself to a few brief remarks.

The general principle, established in *Republic Aviation*[2] and other cases posits that rules prohibiting union solicitation on the employer's property during nonworking time are presumptively unreasonable and discriminatory. That rule is subject to an exception relied on by the majority, which develops the legality of no-solicitation rules in ordinary restaurants and shops.[3] The rationale of these cases, as the majority notes, is the crucial importance of a congenial atmosphere to the success of the business. That is the justification of the exception.

The case at bar—hospital cafeterias and vending machines—does not present the same considerations as warranted the exception wrought for ordinary commercial restaurants. Their role and context is not the main business of a hospital but an ancillary convenience—making refreshment available to staff and visitors (and to patients free to leave their rooms). The hospital cafeteria and vending areas are not in direct competition with ordinary restaurants for this trade. The time and place utility of a hospital cafeteria gives it advantages for custom not bestowed by the food and ambience.

To be sure, the hospital has a legitimate interest in a congenial atmosphere in its cafeteria—but it is not the kind of live-or-die imperative that must be given recognition even though it undercuts the rights of employees protected by the general *Republic* principle.

The distinction I have delineated is reinforced, I think, when it is viewed in conjunction with the hospital's ban on solicitation in direct patient care areas and closely related locations, including corridors that are likely to be used for or involved in patient care, the central purpose of the hospital. I join the majority in upholding this aspect of the hospital's rule. But if, out of necessity, the law permits curtailment of employee rights (union activities) in certain sensitive areas, is there not a fairly correlative expectation of a certain

**63.** 554 F.2d at 481.

**1.** *NLRB v. Beth Israel Hospital,* 554 F.2d 477 (1st Cir. 1977), *cert. granted* sub nom. *Beth Israel Hospital v. NLRB,* 434 U.S. 1033, 98 S.Ct. 764, 54 L.Ed.2d 780 (1978). In *Beth Israel,* the First Circuit granted enforcement to that part of a Board order requiring the hospital to

rescind its rule against distribution and solicitation in the hospital cafeteria and coffee shop.

**2.** *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

**3.** See majority opinion at —————— of 188 U.S. App.D.C., at 357–358 of 578 F.2d *supra.*

receptivity to those rights and activities in other hospital locations?

In my view the statute does not fairly contemplate that a hospital can confine its employees to the closets, and deny them protection in the places most natural for talk that is not patient-related, by leaning on the exception wrought for commercial enterprises to ensure survival.

The Board acted reasonably and with sufficient basis in the record when it concluded that solicitation in such locations as cafeterias and vending machines would not significantly undercut the therapeutic functioning of the hospital. It is only in the most general and non-critical sense that "patient care" is rendered in these areas. They are basically retreats, where patients, staff, and visitors may withdraw from immediate contact with patient care areas. They are natural places for employees to talk about matters of mutual concern such as unions.

I respectfully dissent from that portion of the majority opinion which holds that the Board was not authorized to protect such talk in these cafeteria and vending areas.