**BAYLOR UNIVERSITY MEDICAL CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 76–1940.**

United States Court of Appeals, District of Columbia Circuit.

Jan. 22, 1979.

As Amended Feb. 28, 1979.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for respondent.

Robert W. Smith and Bowen L. Florsheim, Dallas, Tex., for petitioner.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge LEVENTHAL.

MacKINNON, Circuit Judge:

We are here concerned with the implications of the Supreme Court's decision in *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978), for this court's decision in *Baylor University Medical Center·v. NLRB,* 188 U.S.App.D.C. 109, 578 F.2d 351 (1978). Because this involves the relatively recent extension of the National Labor Relations Law to non-profit hospitals, and because the Supreme Court in *Beth Israel* held that different principles are involved where hospitals are concerned, we follow the Court's admonition to review that portion of our prior decision insofar as it relates to "the cafeteria issue."

I

*Baylor* involved a petition for review of a National Labor Relations Board (NLRB) order and a cross-application by the NLRB for enforcement of same. The Board's order required petitioner Baylor to cease and desist from enforcing a "no solicitation" rule as applied to the corridor and cafeteria areas of its hospital. This court denied the application for enforcement with respect to both the corridor and cafeteria areas, with Judge Leventhal dissenting with respect to the cafeteria and vending machine areas. In a per curiam opinion, the Supreme Court granted the Board's petition for certiorari insofar as it sought review of "the cafeteria issue," vacated the court's judgment to that extent, and remanded the case to the court "for reconsideration in light of *Beth Israel* only on that issue." —— U.S. ——, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978).

In *Beth Israel,* the petitioner hospital had a written rule prohibiting employees from soliciting and distributing literature inside the hospital, except in certain employee locker rooms and adjacent washrooms. A local union filed a charge and the Board issued a complaint, setting the matter to be tried before an administrative law judge. The Administrative Law Judge (ALJ) found, *inter alia,* that few places in and around the hospital were available for the

effective exercise of the employees' § 7 rights, and that the petitioner had failed to produce evidence demonstrating the ban's importance in preventing the disruption of patient care. Accordingly, the ALJ concluded, the ban was, on balance, an infringement of the employees' organizational rights.

The Board accepted the ALJ's findings and conclusions, and issued an order directing the petitioner, among other things, to " '[r]escind its written rule prohibiting the distribution of union literature and union solicitation in its cafeteria and coffee shop.' " 437 U.S. at 488, 98 S.Ct. at 2467 (quoting 223 N.L.R.B. 1193, 1199 (1976)).[1] In a subsequent enforcement proceeding, the First Circuit, relying on the presumptive illegality standard of *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), held that "the Board did not err in finding that the hospital had not justified its no-solicitation, no-distribution rule as it related to the cafeteria and coffee shop." 554 F.2d 477, 481.

On certiorari, Justice Brennan's opinion for the Court termed the issue narrow. It was, he wrote, whether "the Court of Appeals erred in enforcing the Board's order requiring petitioner to rescind the rules as applied to the hospital's eating facilities." 437 U.S. at 488, 98 S.Ct. at 2467. The Court's opinion was divided into three parts, corresponding to its analysis of (1) the pertinent facts, (2) the legal standard used by the Board; and (3) the petitioner's assault on that standard as applied.

In rehearsing the relevant facts, the Court stressed (1) that only a fraction of the employees had access to areas where solicitation was permitted; (2) that even these areas were sex-restricted and not commonly used by employees to convey messages and the like; (3) that the cafeteria was a "common gathering place" for the employees; (4) that according to a survey of cafeteria patrons, only 9% were non-employee visitors and only 1.56% were pa-

---

1. Before enforcing the order, the First Circuit inserted the phrase "that part of" before the word "rescind" to make clear that the order applied only to the cafeteria. 554 F.2d at 482.

tients; (5) that the hospital maintained in the cafeteria an official bulletin board for the employees, and had also used the area for solicitations on behalf of charitable organizations and a credit union; (6) that the hospital also maintained in the cafeteria an unofficial bulletin board displaying information of interest to employees only; (7) that few gathering places in and around the hospital were available to the employees, partly because the hospital was located in a congested section of Boston; and (8) that the hospital management had not only failed to cooperate with organizational attempts, but had also made antiunion statements in a newsletter distributed with the employees' pay checks. *See id.* 437 U.S. at 489–491, 98 S.Ct. 2463.

In brief, then, the Court likened the situation to an industrial setting where a management basically hostile to labor goals restricted the only area in and around the "plant" conducive to organizational activities, even though that area was predominately used by employees.

The second part of the opinion in *Beth Israel* primarily sets the stage for the Court's treatment of the petitioner's arguments. It contains a brief history of the Board's "solicitation" rule decisions, the Court's blessing of those decisions in *Republic Aviation,* and the Board's use of those decisions in unfair labor practice cases involving hospitals. In these latter cases, the Board's test is that absent a showing that disruption to patient care would necessarily

result if solicitation were permitted, prohibitions on solicitation in areas other than "immediate patient care" areas are unlawful. In effect, the test is a variation on the *Republic Aviation* theme, designed to accommodate that rule to the special circumstances of health care facilities.

The petitioner challenged the test on four grounds. First it argued that the test conflicted with the congressional policy underlying the 1974 extension of the NLRA [2] to nonprofit health care facilities, namely, that organizational activities not be permitted to disrupt patient care. The Court responded that nothing in the legislative history of the 1974 amendments was inconsistent with the Board's position, and even if it were, the Board's construction was entitled to "considerable deference." *Id.* 437 U.S. at 500, 98 S.Ct. 2463, 2473. Second, petitioner claimed that *Republic Aviation's* principle of limited judicial scrutiny was inappropriate in the hospital context because the required judgments were of a medical nature and therefore outside the Board's traditional expertise. The Court replied that while the Board lacked expertise on health care, it was not necessarily expert in any of the industries whose labor relations it was charged with regulating. It was nonetheless the Board's role, the Court explained, to balance the legitimate conflicting interests of management and labor, hospital or no hospital, and judicial review was limited to determining whether the rule applied was

2. Prior to the 1974 Amendments the Act defined employer as follows:

(2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, *or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual,* or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 152(2) (emphasis added). By the Act of July 26, 1974 Congress brought health

care institutions under the Labor Act by virtue of the following Amendments.

That (a) section 2(2) of the National Labor Relations Act is amended by striking out "or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual,".

(b) Section 2 of such Act is amended by adding at the end thereof the following new subsection:

"(14) The term 'health care institution' shall include any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged person."

P.L. 93–360, July 26, 1974 (88 Stat. 395).

rational and the balance struck therewith was supported "by substantial evidence on the record as a whole." *Id.*

The petitioner's third contention was that the Board's decision was unsupported by the evidence. On that point the Court noted (1) that patients could not visit the cafeteria unless a doctor certified that they could; (2) that it was of *"critical significance* that only 1.56% of the cafeteria's patrons are patients," *id.* 437 U.S. at 502, 98 S.Ct. at 2474 (emphasis added); (3) that petitioner had failed to produce evidence of any detrimental effects resulting from an earlier policy permitting one-to-one solicitation in the cafeteria area; and (4) that evidence of other solicitations in the cafeteria indicated that the "hospital regarded the cafeteria as sufficiently commodious to admit solicitation and distribution without disruption," *id.* (footnote omitted). Thus, the Court believed the petitioner's claim to be meritless on the facts of the case. It acknowledged in this regard, however, that the employers' interests in the hospital context "demands use of a more finely calibrated scale" than is normally the case in § 7 cases. Consequently, the Court said, consideration of otherwise irrelevant factors such as the availability of alternative facilities and the comparable level of risk to patients was appropriate in the health care setting.

Finally, the petitioner asserted that the Board's refusal to apply the rule excepting public retail establishments from the *Republic Aviation* presumption was irrational. The Court retorted that the Board's decision in such cases reflected its balance of the competing interests involved. In contrast to a public restaurant, the Court reasoned, a hospital's "main function" was patient care, while the cafeteria was primarily "an employee service area." *Id.* 437 U.S. at 506, 98 S.Ct. 2463. Hence, the Court said, it was unable to view as irrational the Board's balance in favor of the employees' rights in light of the "primary function and use" of the cafeteria, the unavailability of alternative facilities, and the absence of patient care disruption. *Id.*[3]

In sum, the *Beth Israel* majority refused to create a major exception to the *Republic Aviation* presumption applicable to health care facilities, reaffirmed the limited scope of judicial review in these cases, and yet added the caveat that the balance between the relevant interests in the hospital setting had to be somewhat more employer-oriented than usual. *Beth Israel* decidedly does not hold that a prohibition on solicitation in a cafeteria used by employees is unlawful. The lawfulness of the ban, instead, is determined on the evidence offered in each case; in *Beth Israel,* evidence that the cafeteria was a natural and well-established gathering place for employees, rarely used by others, was regarded as dispositive.

## II

Although in some respects the data on the *Baylor* cafeteria is less complete than that evidently available to the *Beth Israel* Court, there are indications of significant differences between the two cases. Primarily, the cafeteria here is not chiefly "an employee service area," *id.* 437 U.S. at 506, 98 S.Ct. 2463, to the same extent as in *Beth Israel.* Obvious among the differences are: (1) The survey of cafeteria patrons in *Baylor* indicated that 42% of its customers were nonemployees, J.A. at 224, whereas the comparable figure in *Beth Israel* was 11.56%.[4] (2) The *Baylor* cafeteria is apparently "very, very crowded," at least at certain times of the day, J.A. at 225, whereas there was evidence in *Beth Israel* that the hospital regarded its eating facilities as "commodious." (3) The eating arrange-

---

**3.** Justice Blackmun, joined by the Chief Justice and Justice Rehnquist, and Justice Powell, also joined by the Chief Justice and Justice Rehnquist, each wrote separate opinions concurring in the judgment but essentially dissenting from the majority's use of *Republic Aviation* analysis in the hospital context. The unanimity on the result attests to the strong factual record in

*Beth Israel* favoring rescission of the ban on solicitation. *Cf.* pp. ——–—— of 193 U.S.App. D.C., pp. 1293–1294 of 593 F.2d *infra.*

**4.** Actually, the *Beth Israel* Court said 77% were employees, leaving an unidentified 11.44%, so the figure above could be as high as 23%.

ment in the *Baylor* cafeteria was structured in such a way that there was of necessity substantial intermingling of visitors, patients, and employees, J.A. at 225, whereas the *Beth Israel* Court found the cafeteria there a "common" and "natural" gathering place for employees. (4) There was no testimony of prior solicitations in the *Baylor* cafeteria—a witness testified that the place was too crowded for solicitation during the peak hours and that it was a bother the rest of the time, J.A. at 231–32—whereas the hospital in *Beth Israel* had conducted solicitations in its eating facility. (5) There is no indication of an official bulletin board located in the *Baylor* cafeteria—official notices were apparently posted on boards near the nurses' stations, J.A. at 63, and there was mention of a board outside the cafeteria, J.A. at 174—whereas there was an "official" board and an "unofficial" board in *Beth Israel*'s. (6) The *Baylor* hospital is situated on a large campus with extensive outside areas that have seating facilities in attractive surroundings around the principal buildings that are used at meal and break times by employees, J.A. at 324–25, 328–29, 332–33, and with an employees-only parking area, J.A. at 119, whereas the *Beth Israel* hospital was situated in a congested area of Boston. (7) The *Baylor* non-solicitation rule had been in effect for at least *ten years* before any organizational efforts were undertaken, J.A. at 155, whereas the *Beth Israel* rule was changed to combat organizational attempts.

In addition to the foregoing, there was evidence in *Baylor*, but apparently none in *Beth Israel*, that the cafeteria and vending areas were considered at least in part "patient care" areas: patient and visitor use of vending areas was termed "frequent," J.A. at 216; *see* J.A. at 266; at least one vending area was situated off a corridor used for physical therapy, and patient use of the area was deemed part of that therapy, J.A. at 292; the cafeteria manager made it a

practice to mingle with families of patients visiting the cafeteria, and also testified that the cafeteria's non-employee patrons were frequently emotionally disturbed, *see* J.A. at 225–32; the hospital's chaplain often used the cafeteria for sessions with patients' families, J.A. at 254.

In this case the foregoing differences are not trivial, however much the relative placement of bulletin boards or the seating arrangement in the cafeterias may seem so. The *Beth Israel* Court characterized the cafeteria there as an "employee service area" comparable to the type found in an industrial plant; it may be that the cafeteria in *Baylor* is far more an integral part of the hospital's patient care facilities and of service to patient visitors.[5] The uncontradicted testimony indicates that the hospital viewed it as such.

### III

Justice Brennan defined the judicial role in these cases: "The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." 437 U.S. at 501, 98 S.Ct. at 2474 (footnote omitted).

Under the *Beth Israel* holding, the principal error in our analysis of the cafeteria issue was in the application of the rule governing solicitation in public retail establishments to hospital cafeteria cases. We were of opinion that the cafeteria was "operated as a convenience to its patients and their visitors . . ." While this is one of its principal purposes it may be that under *Beth Israel* its use by employees may overshadow its other use. It is arguably unclear from Justice Brennan's discussion of this question in Part IIID of his opinion, 437 U.S. at 505, 98 S.Ct. at 2476; *see* p. —— of 193 U.S.App.D.C., p. 1293 of 593 F.2d

---

5. There are, of course, similarities between the two cases, notably, the comparatively limited number of employees-only, nonwork area inside the hospital building, and the fact that the Baylor management had expressed some anti-

union sentiments. With respect to both of these, however, the *Baylor* situation is less egregious than that found by the *Beth Israel* Court.

*supra,* whether the Board could rationally discard the retail establishment rule in *all* cafeteria cases, or whether its decision to do so in *Beth Israel* was rational. The latter reading is certainly plausible. The penultimate sentence in Part IIID states in part that "it cannot be said that when the primary function and use of the cafeteria, the availability of alternative areas of the facility in which § 7 rights effectively could be exercised, and the remoteness of the interference with patient care are considered, it was irrational to strike a balance in favor of § 7 rights in the hospital cafeteria and against them in public restaurants." 437 U.S. at 506, 98 S.Ct. at 2476. And immediately before this sentence, the *Beth Israel* Court referred to the fact that 77% of the cafeteria patrons were employees. In contrast employee patrons here constitute 58% of the total.[6] Consequently, if the primary purpose of the Baylor cafeteria is patient care and service to their visitors, if alternative areas are available, and if interferences with patient care is not remote, then the analogy to public restaurants is more direct and a refusal to apply the retail rule might be irrational.

■ While this analysis is plausible, however, given the Court's remand, it is not to be preferred. The clear import of *Beth Israel* is to require this Court to determine only whether the Board's decision to strike a balance against Baylor's interests is supported by the evidence. To say that it is is to say that Baylor failed to meet its burden of overcoming the *Republican Aviation* presumption with evidence justifying the prohibitions as necessary to avoid disruption of patient care.

On this record, immediate enforcement of the Board's order would be ill-advised. The Board did not consider, because it incorrectly believed that it did not have to, the availability of alternative areas in and especially around the facility for solicitation. That consideration is important, for while Baylor's evidence may not justify a no-solicitation/no-distribution rule applicable to the entire operating schedule of the cafeteria (6:30 A.M. to 6:30 P.M.) it does justify, in our view, a continuation of the ban during some periods. It is reasonable to infer from the evidence that a solicitation or distribution in the cafeteria at 9:00 A.M. would not be too disruptive of patient care; that inference becomes materially less reasonable when applied to the peak hours of the cafeteria's operating schedule.

Testimony indicated, for example, that the ratio of employees to visitors/patients during the cafeteria's evening meal between 4:30 and 6:00 P.M. is "almost a one on one."[7] Moreover, proscribing organizational activities during certain limited periods of the day when the risk to patient care is at its highest would not unreasonably burden the employees' § 7 rights because those periods generally correspond to when employee use of alternative areas is most likely. The evidence shows that the landscaped and concrete terrace areas around the hospital are designed for and heavily used by the employees. J.A. at 324–25,

---

6. J.A. 224.

7. This testimony appears at p. 482 of the hearing transcript, which was not included in the excerpts contained in the Joint Appendix. The testimony is that of Robert Wooldridge, Director of Central Food Services at Baylor. *See* J.A. at 219. On cross-examination, Mr. Wooldridge was asked to identify the ratio of employee to nonemployee patrons in the hospital cafeteria during the peak hours. J.A. at 234. In a portion of the hearing transcript not included in the Joint Appendix, Mr. Wooldridge testified as follows:

Q. (By Mr. Hooks) And the next peak period?

A. The next peak period would be the evening meal, and that runs from about 4:30 to 6:00.

Q. And what would be the relationship at that point?

A. I would think it would be almost a one on one at the evening meal. That's when we have a high visitation period in the hospital. Tr. at 482.

According to Mr. Wooldridge's testimony, there are two other peak periods: during the morning hours of 7:00 to 9:00 when the ratio of employee patrons to patient/visitor patrons is approximately 4 to 1, Tr. at 482; and during the lunch hours of 11:00 to 1:00 when the cafeteria is most crowded and the ratio is approximately 3 to 1, J.A. at 234–35.

328–29. Solicitation is allowed in these areas. J.A. at 73. That the resolution of the "cafeteria issue" need not be an all-or-nothing affair underscores the significance of the Board's failure to consider this evidence.

■ In sum, the Board's order, at least as currently phrased, is not supported by substantial evidence. On remand the Board should consider whether Baylor's rule ought to be upheld insofar as it bans solicitation and distribution in the cafeteria during the peak evening period or any other period when the cafeteria is crowded and patients and visitors patronize it in substantial numbers.[8] As we interpret *Beth Israel,* it does not prevent Baylor from prohibiting one-to-one solicitation and distribution in the cafeteria, at least during the most crowded periods of the day.

The case is remanded to the Board for reconsideration in the light of *Beth Israel* and the foregoing opinion and the Board is hereby authorized to submit an enforcement order. In so doing, it should consider whether the nonemployee use of the cafeteria [9] is of sufficient magnitude during any portion of the day so as to warrant continuation of the no solicitation/no distribution rule during those times. It should also consider whether the no solicitation/no distribution rule with respect to the cafeteria is an unreasonable burden on the employees' § 7 organizational rights during certain periods of the day when employee use of alternative facilities is most likely. *See*

J.A. at 324–25. In the interest of expedition, Baylor might propose a new rule on solicitation and distribution in the cafeteria areas, embodying its views on the legal rule as it applies to the facts known to Baylor in the light of *Beth Israel* and the analysis in this opinion. As we have said, nothing in *Beth Israel* makes the "cafeteria issue" an all-or-nothing affair, and the Board's resolution of that issue, as to all times of the day, must be supported by the evidence and reasonable inferences derived therefrom.[10]

*Judgment Accordingly.*

LEVENTHAL, Circuit Judge, dissenting:

The majority has in effect remanded to the Board for further consideration in the light of the Supreme Court's *Beth Israel* decision.[1]

It is hard to quarrel with a remand for reconsideration in the light of a Supreme Court ruling. But my reasons for believing that the Board's order as it stands should be affirmed and enforced as to the cafeteria and machine areas,[2] are entirely congruent with, and indeed are reinforced by, the *Beth Israel* decision. While there are some differences in the fact situations, they do not seem to me to be material to the rule of the Baylor Medical Center involved in this case. Baylor's rule was a strict prohibition of solicitation. I do not see how it can stand consistently with *Beth Israel.*

Determining whether a different rule would be valid requires that the hospital take the initiative and is not, as the court's

---

**8.** *Id.*

**9.** The Supreme Court has remanded "the case . . . for reconsideration in light of *Beth Israel* only on ['the cafeteria'] issue." We interpret that to not include the areas where vending machines are located throughout the hospital. Many of these areas are small and for the convenience of staff, patients, and visitors and are off the corridors. J.A. at 127, 153, 200, 216, 265, 292, 316, 332. If the Board considers that any of these areas should be open to solicitation it should make separate findings, and in so doing should also consider the risk to unsteady patients that might result if distribution, with its attendant litter problem, were permitted. J.A. at 335.

**10.** The dissent's quarrel with the above disposition appears ultimately to be one of form, not substance. We believe the route we have chosen—*i. e.,* a remand to the Board—is the one most likely to result in a swift and final resolution of this matter.

**1.** *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). The mandate would also permit some reconsideration of the order as to the vending machine areas, dependent on findings.

**2.** *See Baylor Univ. Medical Center v. NLRB,* 188 U.S.App.D.C. 109, 118–19, 578 F.2d 351, 360–61 (Leventhal, J., dissenting), *vacated and remanded,* —— U.S. ——, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978).

remand supposes, dependent in the first instance on the Board. The court suggests that Baylor might propose a new rule (p. —— of 193 U.S.App.D.C., p. 1296 of 593 F.2d). This is salutary, but it does not cure the basic problem that the majority puts the onus on the Board to proceed.

I would therefore affirm and order enforcement forthwith of that part of the Board's order that required the Baylor University Medical Center to cease and desist from enforcing the rule it has promulgated.