**BAYLOR UNIVERSITY MEDICAL CENTER, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1459.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1981.

Decided Aug. 20, 1981.

---

Petition for Review and Cross-Application of an Order of the National Labor Relations Board.

Robert W. Smith, Dallas, Tex., with whom Bowen L. Florsheim, Dallas, Tex., was on the brief for petitioner.

Collis Suzanne Stocking, Atty., N.L.R.B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., was on the brief for respondent.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

This is the third appearance of this case in this court. It involves the permissible methods by which hospital employees may solicit union membership. In particular, the questions raised are whether the Baylor University Medical Center's "no-solicitation" rule may properly forbid union solicitation by hospital employees in the hospital's vending areas and cafeteria.

## I

In the 1974 Health Care Amendments the reach of the nation's labor laws was extended to include hospitals. Act of July 26, 1974, Pub.L.No.93–360, 88 Stat. 395. The strong need for tranquility in hospitals posed problems with respect to the manner and areas where union solicitation should be permitted. In the typical industrial setting, an employer ban on union solicitation by employees during nonworking time is presumptively invalid. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Likewise, employer bans on distribution of literature are presumptively invalid during nonworking time in nonworking areas. *E. g., Stoddard-Quirk Manufacturing Co.*, 138 N.L.R.B. 615 (1962). Exceptions have been recognized for department stores and restaurants—an employer in such a retail setting may prohibit union solicitation in areas where the public is invited even during an employee's nonworking time. *Bankers Club, Inc.*, 218 N.L.R.B. 22, 27 (1975) (restaurant); *Marshall Field & Co.*, 98 N.L.R.B. 88 (1952) (department store), *enf'd*, 200 F.2d 375 (7th Cir. 1953).

The Board devised a special presumption for health care institutions in *St. John's Hospital & School of Nursing, Inc.*, 222 N.L.R.B. 1150 (1976), *enforcement granted in part and denied in part*, 557 F.2d 1368 (10th Cir. 1977). This rule made a solicitation ban presumptively invalid in all areas of a hospital other than "immediate patient care areas." [1] After receiving less than universal acceptance by the courts of appeals, the presumption came before the Supreme Court in *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). That opinion by Justice Brennan upheld

the Board's policy—which requires that absent [a showing of a substantial threat of harm to patients] solicitation and distribution be permitted in the hospital except in areas where patient care is likely to be disrupted—[as a permissible] construction of the Act's policies as applied to the health-care industry by the 1974 amendments.

437 U.S. at 500, 98 S.Ct. at 2473. The Court also upheld the application of the presumption in *Beth Israel*, as the Court later described it, "to a hospital cafeteria maintained and operated primarily for employees and rarely used by patients or their families." *NLRB v. Baylor University*

---

1. "Immediate patient care areas" is the phrase used by the Board and courts to describe what the Board in *St. John's Hospital* called "strictly patient care areas":

For example, a hospital may be warranted in prohibiting solicitation even on nonworking time in strictly patient care areas, such as the patients' rooms, operating rooms, and places where patients receive treatment, such as x-ray and therapy areas.

222 N.L.R.B. at 1150.

*Medical Center,* 439 U.S. 9, 10, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978) (per curiam).

In 1979 the Court had another opportunity to consider the Board's application of its presumption. *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979), involved a hospital rule that prohibited solicitation by employees "in any area of the Hospital which is accessible to or utilized by the public." *Id.* at 775, 99 S.Ct. at 2600. The Court agreed with the Sixth Circuit that there was no substantial evidence to support the Board's order forbidding the hospital from prohibiting solicitation in its corridors and sitting rooms that adjoined or were accessible to patients' rooms and operating and treatment rooms. The Court also held, however, that the Board had properly ruled that the hospital had not overcome the presumption of invalidity of the "no-solicitation" rule with respect to the hospital's cafeteria, gift shop, and lobbies on the first floor of the hospital.

The Court noted a number of factors that led to its decision regarding the cafeteria and other public areas located on the first floor. First, the hospital presented "no clear evidence" of the frequency of use of the first floor areas by patients. The evidence indicated only occasional patient visits to the public areas of the first floor. This determination was underscored by evidence that indicated that, to eat in the cafeteria, a patient must have "special permission." From this evidence, the Court noted it would be reasonable to conclude "that only those patients who are judged fit to withstand the activities of the public areas on the first floor are allowed to visit those parts of the Hospital." 422 U.S. at 786, 99 S.Ct. at 2605. The Court also noted that two officials of the hospital testified that "at least some kinds of solicitation in public areas such as the cafeteria would be unlikely to have a significant adverse impact on patients or patient care."[2]

**2.** 442 U.S. at 786, 99 S.Ct. at 2605. The Court disagreed with the Sixth Circuit's "apparent view ... that the Board's presumption is irrational in all respects." *Id.* at 787, 99 S.Ct. at 2606. The Court did warn the Board, however, that "the experience to date raises serious doubts as to whether the Board's interpretation of its present presumption adequately takes into account the medical practices and methods of treatment incident to the delivery of patient-care services in a modern hospital." *Id.* at 789, 99 S.Ct. at 2607.

In a memorandum to the Regional Directors, the General Counsel of the NLRB discussed the impact of *Baptist Hospital.* Memorandum from General Counsel to Regional Directors (Oct. 5, 1979), *reprinted in* [1979] Lab.L.Rep. (CCH) ¶ 9208, at 15,934 (Nov. 2, 1979). The General Counsel discussed the appropriateness of extending the definition of "immediate patient care areas."

The Regions should ... suggest that the Board reexamine its definition of immediate patient care areas in the context of applying the *St. John's* no-solicitation—no-distribution rules in health-care facilities. In view of the historical success hospitals have had in overcoming the Board's presumption in this regard, the Regions should not argue that the *St. John's* areas are the only ones that can be treated as patient care areas. Rather, the Regions should suggest that patient care areas can also include such places as corridors adjacent to patients' rooms, operating rooms and treatment areas; sitting rooms on patient floors accessible to or used by patients;

and elevators or stairways used substantially to transport patients.

*Id.* at 15,936 (footnotes omitted).

With respect to public access areas such as cafeterias and vending areas, the General Counsel stated that such areas

would continue to be places in which solicitation is presumed to be protected. It is important to note that, although *Beth Israel* upheld the invalidity of the ban insofar as it covered the cafeteria in that case, it did not establish the broad principle that a solicitation ban in cafeterias or similar public places would *ipso facto* be unprivileged. On the contrary, with the benefit of the guidance provided by the *Baptist Hospital* opinion, courts will undoubtedly take a closer look, on a case-by-case basis, at the evidence and arguments relied upon by hospitals to justify solicitation bans in each of these areas. It is imperative, therefore, that a complete investigation be conducted and a full record be established in the remanded cases as to the relative use of each public access area by employees, as compared to the use by patients and/or their visitors; the time periods when employees would be most likely to congregate in each area; the physical layout of each area and its relationship to other areas; whether the area in question is a "natural gathering place" for employees; and the physical and/or mental and emotional condition of patients who would be likely to use the area.

*Id.* at 15,937–38.

## II

Baylor University Medical Center ("Baylor") is a five-hospital complex located in Dallas, Texas. In June of 1975 it issued a new interpretation of its long-standing no-solicitation rule. The rule as interpreted stated:

> Solicitation of employees of Baylor University Medical Center by other employees or distribution of literature between employees is prohibited during work time and/or in work areas. The term "work areas" includes patient care floors, hallways, elevators or any other area, such as laboratories, surgery or treatment centers, where any type of service is being administered to or on behalf of patients and also includes any areas where persons visiting patients are likely to be disturbed. Service to our patients and their visitors includes not only primary and acute medical care, but food service and psychological support.

*Baylor University Medical Center*, 225 N.L.R.B. 771, 772–73 (1976), *enforcement denied and remanded*, 578 F.2d 351 (D.C.Cir.), *vacated in part and remanded*, 439 U.S. 9, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978), *remanded*, 593 F.2d 1290 (D.C.Cir.1979). Local 648 of the Laborers International Union of North America (AFL–CIO), which had begun an organizing campaign at Baylor in the fall of 1974, complained to the Regional Director of the General Counsel that Baylor's no-solicitation policies violated section 8(a)(1) of the National Labor Relations Act.[3]

The Board's original decision in this case consisted of the adoption of the recommended order of the Administrative Law Judge (ALJ), and the affirmation of his rulings, findings and conclusions. *Baylor University Medical Center*, 225 N.L.R.B. 771 (1976). The ALJ, relying on minimal factual findings, disposed of the case by mechan-

ically invoking the *St. John's* presumption, holding the solicitation ban invalid in all areas of the hospital other than "immediate patient care areas."[4]

On petition for review and cross-application for enforcement, this court denied enforcement of the Board's invalidation of Baylor's no-solicitation rule. *Baylor University Medical Center v. NLRB*, 578 F.2d 351 (D.C.Cir.) ("*Baylor I*"), *vacated in part and remanded*, 439 U.S. 9, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978). The opinion focused on three non-immediate patient care areas— the corridors, the cafeteria and the vending areas. With respect to the corridors, we held that the "importance of preventing crowding and disruption in the hospital corridors" justified the solicitation ban. *Id.* at 354–57. The opinion treated the cafeteria and vending areas together and reasoned that, in judging the validity of solicitation bans, they should be treated like retail stores and restaurants. Since these last-mentioned establishments are permitted to ban solicitation in areas open to the public, we concluded that Baylor could enforce its ban in its cafeteria and vending areas. *Id.* at 357–58.

The Court disposed of the NLRB's petition for certiorari in *Baylor I* by relying on its then-recent decision in *Beth Israel*. In a *per curiam* opinion the Court stated:

> As the Court's decision in *Beth Israel* is relevant to the cafeteria issue in this case, we grant the petition for a writ of certiorari, vacate the judgment, and remand the case to the Court of Appeals for reconsideration in light of *Beth Israel* only on that issue. Insofar as the petition for certiorari seeks review of the corridor issue, the petition is denied.

*NLRB v. Baylor University Medical Center*, 439 U.S. 9, 10, 99 S.Ct. 299, 58 L.Ed.2d 202 (1978).

---

3. "It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title ...." 29 U.S.C. § 158(a)(1). Section 157 of title 29 (section 7 of the NLRA) gives employees the right, *inter alia*, to "engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

4. Baylor was ordered to "[r]escind its rules restricting the areas in which employees may solicit on behalf of a labor organization during the employees' nonworking time insofar as it applies to other than immediate patient care areas, and prohibiting distribution of union literature during employees' nonworking time in nonworking areas of its operations or on its outside premises." 225 N.L.R.B. at 778.

Our second opinion in this case followed the Supreme Court's remand. After recounting the Court's opinion, we stated:

> *Beth Israel* decidedly does not hold that a prohibition on solicitation in a cafeteria used by employees is unlawful. The lawfulness of the ban, instead, is determined on the evidence offered in each case; in *Beth Israel*, evidence that the cafeteria was a natural and well-established gathering place for employees, rarely used by others, was regarded as dispositive.

*Baylor University Medical Center v. NLRB*, 593 F.2d 1290, 1293 (D.C.Cir.1979) (*"Baylor II"*). After listing the significant differences between Beth Israel Hospital and Baylor,[5] we concluded that our task was

> to determine only whether the Board's decision to strike a balance against Baylor's interests is supported by the evidence. To say that it is is to say that Baylor failed to meet its burden of overcoming the *Republic Aviation* presumption with evidence justifying the prohibitions as necessary to avoid disruption of patient care.

*Id.* at 1295.

We concluded that, on the record as it then stood, "immediate enforcement of the Board's order would be ill-advised." *Id.* We instructed the Board to consider on remand

> the availability of alternative areas in and especially around the facility for solicitation. That consideration is important, for while Baylor's evidence may not justify a no-solicitation/no-distribution rule applicable to the entire operating schedule of the cafeteria (6:30 A.M. to 6:30 P.M.) it does justify, in our view, a continuation of the ban during some periods.

*Id.* We noted the evidence in the record that indicated that the ratio of employees to patients and visitors during the cafeteria's evening meal (4:30 to 6:30 p.m.) was almost one-to-one. We also pointed out the evidence that showed that the "landscaped and concrete terrace areas around the hospital are designed for and heavily used by the employees." *Id.*

On remand the Board adhered to its earlier position that the solicitation ban could not be applied in the vending areas and cafeteria. *Baylor University Medical Center*, 247 N.L.R.B. No. 178, 103 L.R.R.M. 1311 (Feb. 22, 1980). It received no additional evidence.[6] The availability of the outside

---

**5.** Obvious among the differences are: (1) The survey of cafeteria patrons in *Baylor* indicated that 42% of its customers were nonemployees, J.A. at 224, whereas the comparable figure in *Beth Israel* was 11.56%. (2) The *Baylor* cafeteria is apparently "very, very crowded," at least at certain times of the day, J.A. at 225, whereas there was evidence in *Beth Israel* that the hospital regarded its eating facilities as "commodious." (3) The eating arrangement in the *Baylor* cafeteria was structured in such a way that there was of necessity substantial intermingling of visitors, patients, and employees, J.A. at 225, whereas the *Beth Israel* Court found the cafeteria there a "common" and "natural" gathering place for employees. (4) There was no testimony of prior solicitations in the *Baylor* cafeteria—a witness testified that the place was too crowded for solicitation during the peak hours and that it was a bother the rest of the time, J.A. at 231–32—whereas the hospital in *Beth Israel* had conducted solicitations in its eating facility. (5) There is no indication of an official bulletin board located in the *Baylor* cafeteria—official notices were apparently posted on boards near the nurses' stations, J.A. at 63, and there was mention of a board outside the cafeteria, J.A. at 174—whereas there was an "official" board and an "unofficial" board in *Beth Israel's*. (6) The *Baylor* hospital is situated on a large campus with extensive outside areas that have seating facilities in attractive surroundings around the principal buildings that are used at meal and break times by employees, J.A. at 324–25, 328–29, 332–33, and with an employees-only parking area, J.A. at 119, whereas the *Beth Israel* hospital was situated in a congested area of Boston. (7) The *Baylor* non-solicitation rule had been in effect for at least *ten years* before any organizational efforts were undertaken, J.A. at 155, whereas the *Beth Israel* rule was changed to combat organizational attempts.
593 F.2d at 1293–94 (footnote omitted) (emphasis in original).

**6.** Although the General Counsel suggested to the Board that it remand for further hearing, the Board considered the record complete and issued its supplemental decision based on the original record. Slip op. at 2 n.6, 103 L.R.R.M. at 1312 n.6.

grounds as a suitable alternative area for solicitation was summarily rejected by the Board—"Attempting to contact 3,700 employees located throughout various buildings on the sprawling grounds of the medical center complex would be a herculean task." Slip op. at 7, 103 L.R.R.M. at 1313. The opinion is silent on the advisability or desirability of permitting Baylor to ban solicitation in the cafeteria during those times when the concentration of patients and visitors is highest. Because we still believe that a consideration of these factors is important and because there is no substantial evidence in the record to support the Board's complete disapproval of the solicitation ban in the cafeteria and vending areas, we must again remand to the Board.

## III

In our view the Board's decision in this case is flawed both by mischaracterization and by the absence of substantial evidence in the record to support many of its factual findings.

The Board lists as Baylor's only justification for its rule a belief that it is necessary to ensure a tranquil atmosphere. The Board posits that union solicitation is not uniquely capable of disrupting tranquility, and then notes that "there is no rule prohibiting any topic of conversation, save that of union solicitation." Slip op. at 5, 103 L.R.R.M. at 1313. Reiterating this point, the Board adds: "Nor would it appear that discussion of medical matters, disease, and death would be particularly reassuring to

patients." *Id.* at 6, 103 L.R.R.M. at 1313. The Board here confounds the difference between solicitation and conversation. As we noted in *Baylor I,* "solicitation has a disruptive force quite apart from its contribution to noise level and overcrowding. There was evidence at the hearing that witnessing solicitation tends to undermine both patients' and visitors' confidence in the hospital." 578 F.2d at 356 (citing App. at 343 (testimony of Dr. A. D. Sears) and App. at 209 (testimony of Dr. John Goodson)). Solicitation differs from conversation. Baylor does not permit all forms of communication except union solicitation—its ban extends to *all* forms of solicitation.

The Board implies that Baylor does not uniformly enforce its solicitation ban, and in so doing discriminates against union solicitation: "The Respondent . . . engages in and permits various forms of solicitation, e. g., weddings, retirements, bake sales, and a 'benefit fair' . . . ." Slip op. at 6, 103 L.R.R.M. at 1313. There is no record support for a claim of discriminatory enforcement of Baylor's solicitation ban and no evidentiary support for these other forms of solicitation being as disruptive or extensive as union solicitation. The General Counsel acknowledged at the hearing that the NLRB had not "alleged any discriminatory application of the rule," App. at 55, and we noted in *Baylor I* that "there is no indication that [Baylor's] no-solicitation rule was in any way discriminatory or directed against efforts at unionization."[7] The

---

7. 578 F.2d at 355. The occurrence of occasional solicitation for gifts does not indicate that the practice is permitted or condoned. Howard Chase, the Associate Executive Director of Baylor, who was responsible for the central departments that provide services to all the hospitals on the campus, testified concerning the problem of stopping all incidents of solicitation.

Q. (By Mr. Smith) Mr. Chase, you testified earlier to a policy with regard to no solicitation, and that this is enforced and supervisors are instructed to enforce it.

Does the administration of your hospital condone solicitations of even such things as flowers and gifts?

A. No, we don't.

In fact, we have specifically asked that there not be that type of solicitation activity.

. . . .

It has occurred from time to time, but it is not an endorsed thing. It's hard when you have an institution that's the size that Baylor is and covers as many city blocks as it does. . . . It's hard for a small group of administrators to insure that in every case one of these things doesn't happen, but the official policy and the reminders are frequently made that it is not an approved thing.

Q. . . . Sir, have you had any occasion recently to observe any such activity?

A. There's one that occurred not long back where Mr. Bill Rohloff testified here yesterday that he stopped the collection of money to buy flowers for the wife of a unit manager

Board has improperly suggested that Baylor has singled out union solicitation for eradication.

The Board relies on slim evidence to support its claim that union solicitation in the cafeteria would not disrupt patients and visitors. "Employees Goolsby and Mosely testified without factual contradiction that they solicited authorization cards in the cafeteria without disruption." Slip op. at 6, 103 L.R.R.M. at 1313. True, there was testimony that employees had engaged in isolated instances of solicitation in the cafeteria without creating a "fight," "commotion," or "argument" among the employees solicited. App. at 64. They did not testify, however, that no disruption of patients and visitors occurred, and it would be unreasonable to expect Baylor to produce evidence of disruption given that the incidents were isolated and prohibited. Baylor did produce the testimony of several witnesses who testified that solicitation in the cafeteria *would* disrupt patients and visitors. App. at 231–32 (statement of Robert Wooldridge, Director of Central Food Services); *id.* at 209–12 (statement of James Goodson, gynecologist physician and surgeon); *id.* at 157–58 (statement of Howard Chase, Associate Executive Director).

The Board states that "[p]atients who eat in the cafeteria must obtain permission from their attending physician and consequently it may be assumed that they have been 'judged fit to withstand the activities of the public areas . . . .'" Slip op. at 6, 103 L.R.R.M. at 1313 (quoting *Baptist Hospital*, 442 U.S. at 786, 99 S.Ct. at 2605). This assumption finds no support in the record. The General Counsel points to the

following testimony to support the Board's finding that patients may only eat in the cafeteria with their doctor's permission:

Q. Now, we have also had testimony several times during this hearing that patients come into your cafeteria, but I want to make sure the record is clear.

In-patients get fed on the floor and in their rooms. That's correct, isn't it?

A. [by Robert Wooldridge, Director of Central Food Services] No, that's not correct.

That is normally correct, but—

JUDGE VON ROHR: I think that's the answer. That's normally correct. There are exceptions. I'm sure we all realize that.

Q. . . . And if they wish to visit with their family, and they're well enough, as a matter of their own personal desire they may go into the cafeteria for a snack or meal?

A. They may eat all their meals in the cafeteria if their doctor allows them.

App. at 447–48. Although this testimony indicates that a patient must have his doctor's permission if he wishes to eat *all* his meals in the cafeteria, it does not suggest whether or not the doctor's permission is required for an occasional meal there. This evidence that a patient may need his doctor's permission to eat in the cafeteria is too slim to support the conclusion, drawn by the Board, that patients who eat in the cafeteria can "withstand the activities of the public areas." Additionally, visitors, of course, do not need a doctor's permission to eat in the cafeteria. Yet, the Baylor position all along has been its solicitation ban protects *both* patients *and* visitors.[8] Thus, there is

---

who was in the hospital as a patient at that time and asked that the person who was collecting it be sure that the people that had given got their money back on it.

App. at 335–37.

**8.** As Dr. James Goodson, a gynecologist physician and surgeon who maintained an office in a plaza attached to the medical center, testified:

I feel like a Hospital's only function is patient care. And I feel like since that's its only function, it needs to do the very best it can in this area, which includes not just the mechanics of excellent patient care but also

concern for the feelings that the patient has and the patient's relatives have. I think the patients are in a unique position as far as customer of the Hospital, if you could use that term in that they don't enter voluntarily; they may come involuntarily, but they come because they've got to. I don't think anybody wants to be confined to a hospital and just walks in for a rest. Maybe there's a few cases, but they're very few. So, they're there

no support for the Board's conclusion that the non-employee customers of the cafeteria will not be disturbed by union solicitation, while there is evidentiary support for the opposite conclusion.

In non-hospital cases the availability of alternative areas for solicitation is irrelevant to the determination of whether a ban on solicitation is valid. The Supreme Court has recognized, however, that different considerations in the health care context make proper an inquiry into the availability of alternative areas.[9] Because the Board had not considered the availability of alternative areas in its original decision, we instructed it to consider "the availability of alternative areas in and especially around the facility for solicitation." 593 F.2d at 1295. The Board's consideration of the issue consisted of the following:

> because they're apprehensive, something wrong with them or more than likely, something really is wrong with them. And they're a bundle of nerves because they're not at all sure what's wrong with them and not sure the doctor knows what's wrong with them.
>   They're not sure anybody really cares totally for their well being. And anything that disrupts this, just fortifies their fears tremendously.
> Q. Would the same thing be applicable to loved ones of the patients and visitors of the patients?
> A. Yes, sir. I think many times they're more of a problem because the patient may very well have confidence in the doctor. But that doesn't necessarily mean the family does. I think probably half of our value in the medical profession is treating relatives. You don't treat them physically, you treat them emotionally because they're so concerned for their loved one who is sick.
> App. at 208–09. *Accord, id.* at 163 ("anytime a person is hospitalized, ... the patient ... and family members are under unusual stress") (statement of Howard Chase, Associate Executive Director of Baylor).

9. *Beth Israel Hospital v. NLRB*, 437 U.S. at 505, 98 S.Ct. at 2475:
> While outside of the health-care context, the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry, see *[N.L.R.B. v.] Babcock & Wilcox*, [351 U.S. 105, 112–13, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956)], it may be that the importance of the employer's interest here demands use of a more finely calibrated scale. For example, the availability of one part of a health-care facility for organizational activity might be

While it may be true, as Respondent contends, that the moderate climate of Dallas is helpful to outdoor solicitation that is no more than a mitigating factor in considering its rule which, as a practical matter, makes the workplace off limits to employee discussion of workrelated matters. Attempting to contact 3,700 employees located throughout various buildings on sprawling grounds of the medical center complex would be a herculean task.

Slip. op. at 7, 103 L.R.R.M. at 1313. We believe the Board has jumped to a conclusion here, with little or no evidentiary support. To the extent the record contains evidence of the use of the grounds by the employees, it suggests that solicitation there would be convenient.[10]

> regarded as a factor required to be considered in evaluating the permissibility of restrictions in other areas of the same facility.

10. Howard Chase testified extensively concerning the use of the grounds by employees:
> Q. (By Mr. Smith) Now, you heard the testimony that employees do in fact take their breaks outside from time to time.
> A. Yes, sir.
>   . . . .
>   And Dallas weather is usually good, even through the winter months, when it is uncomfortable to be outside, there are really very few.
>   . . . .
>   ... [B]etween the areas that have been described as Hoblitzelle Hospital and Truett Hospital is a very beautifully landscaped court area, large fountain with benches all the way around it, which is a very common place for employees to be at their break time, as well as during the meal thirty-minute period.
>   There are also benches at various locations on the sidewalks that lead down to Gaston Avenue, which are also used as periods of relaxation for employees.
>   But because of the fountain and landscaping that's a very popular area.
>   . . . .
>   THE WITNESS: A second attractively landscaped area is an area that goes on over to the Medical Plaza building ... up to the connecting corridor. There are a number of benches and attractively done shrub and garden areas there which have become a very popular spot for employees.
>   The same theme is carried through on the opposite side of that corridor, as you ap-

The Board attempts to lessen the appeal of the alternative areas by extolling the attractiveness of the cafeteria as a place for solicitation. It states that the cafeteria "is the only area where employees from the five hospitals and medical support departments congregate on a regular basis." Slip op. at 6, 103 L.R.R.M. at 1313. This suggests that all employees use the cafeteria for their meals or breaks. The evidence is to the contrary. One hospital official testified that less than half of the employees take their break in the cafeteria and that a "majority" eat their one major meal there. App. at 420–21 (statement of Howard Chase, Associate Executive Director).

We also find the Board's resolution of the vending areas issue unsatisfactory. In *Baylor II* we noted that it was not clear whether the Supreme Court's remand included the vending machine areas.[11] We interpreted the remand not to "include the areas where vending machines are located throughout the hospital. Many of these areas are small and for the convenience of staff, patients, and visitors and are off the corridors. [App.] at 127, 153, 200, 216, 265, 292, 316, 322." 593 F.2d at 1296 n.9. We made it possible, however, for the Board to reconsider the vending areas question: "If the Board considers that any of these areas should be open to solicitation it should make separate findings . . . ." *Id.*

On remand, the Board acknowledged that Baylor presented evidence "that as part of physical training some patients use the vending machines . . . and occasionally ambulatory patients and visitors use the machines." Slip op. at 8, 103 L.R.R.M. at 1314. The Board did not find this evidence sufficient to justify the ban on solicitation, however, since "this evidence falls far short of that necessary to establish that the vending areas are areas of immediate patient care." *Id.* We do not believe that this should be the end of the inquiry. Under the Board's *St. John's* presumption, a solicitation ban

---

proach Junius Street. Both of those have become areas of considerable use at break times and meal times.

The third area is in the terraced location around the entrance-way to the Jonsson Hospital. There is an aggregate and concrete terrace from the area just above the nuclear medicine department all the way over to what is shown as Adair Street in the top portion of this exhibit and to the left. That probably goes two hundred feet in length with a number of benches, a fountain area there, with an area to sit around it, and also with landscaping. There are steps that lead down from that terrace to Junius Street, which are points where many employees would go out and sit on the steps at break time.

. . . .

. . . And there are a number of areas, kind of rock walls where terraced gardens have been established, that are just used to sit on break periods, and we have numerous people outside during that time. I think those are primarily Collins Hospital employees that would utilize that area.

Q. People go into vending rooms, get cold drinks and things and bring them out and sit in this area?

A. Yes. In fact that's the only reason we can tolerate the small vending areas we have now. They're too small.

What we'd like to have now, and many people do take their food items and drinks and get them and go out to another area. It makes it possible to have a relaxing break in a fifteen-minute time period.

. . . .

THE WITNESS: Another area that substantial numbers of our employees use is outside of the Veal Hospital. Several references have been made to the vending room that is adjacent to the nuclear medicine department . . . .

Employees from the offices and departments throughout this portion of the building will go to that vending room to get a Coke or whatever, Coke or coffee, and go out through this lobby which is maybe a hundred feet away from steps in front of the Veal Hospital, and then there is a substantial area there before you get to Junius Street that is a lawn area and will have—and well, we'll have fifty people on many days at this time of year just out there sitting having their lunch in that period, sitting on the grass. And that area I would also consider to be one where we would not enforce the no-solicitation rule among employees.

. . . .

In summary, on all sides of the campus here and across the street at Collins, there's a number of areas used by employees throughout the day for breaks.

App. at 324–25, 328–29, 332–34.

11. 593 F.2d at 1296 n.9. The language from the Court's opinion that caused the confusion is quoted at page 60, *supra.*

outside of an immediate patient care area should be upheld if the hospital makes a showing that the ban is necessary to prevent a disruption of patient care. It does not appear that the Board considered this question, but instead terminated the inquiry after deciding that the vending areas were not immediate patient care areas. The Board's decision on the vending issue is additionally flawed by its misguided view of the absence of alternative areas for solicitation. *Id.*

We thus must reject the Board's ruling on the vending areas. On remand the Board should consider whether the evidence submitted by Baylor is sufficient to overcome the *St. John's* presumption. It would appear difficult for Baylor to establish the necessity of preventing solicitation in the vending areas after the cafeteria closes and when darkness makes the grounds unsuitable for solicitation. Conversely, the evidence in the record as it now stands—showing the location of the vending areas as "off the corridors" and indicating they are regularly used by patients and their visitors—suggests that a ban during the daytime hours would probably be permissible. The Court in *Baptist Hospital* refused to set aside the ban on solicitation in "the corridors and sitting rooms on patients' floors." 442 U.S. at 785, 99 S.Ct. at 2605. In any event, the record as presently constituted does not support the Board's decision.

### IV

The record does not support the Board's total invalidation of Baylor's solicitation ban in its cafeteria and vending areas. Two factors are involved in such a ruling. First, the evidence indicates that approximately 40% of the cafeteria's patrons are non-employees. Second, the evidence shows that the exterior grounds of the hospital complex are a convenient place for solicitation, and that they are widely used by employees. This is the evidence that we held required an earlier remand, and our disapproval of the Board's method of dealing with that evidence requires another remand. The record as it now stands may support an order by the Board preventing Baylor from enforcing its ban in the vending areas from 6:30 p. m. to 6:30 a. m., when the cafeteria is closed and the use of the grounds is not feasible, and in the cafeteria during non-meal times, when the proportion of employees to non-employees is relatively high. Any greater prohibition on enforcement of the ban would require additional evidence.

*Remanded.*